GROCERS JOURNAL COMPANY, Appellant, v. MIDLAND PUBLISHING COMPANY, Respondent.

St. Louis Court of Appeals, October 22, 1907.

1. **TRADEMARK: Names of Newspapers: Transfer of Name.** The right of trademark exists in the title of a newspaper; such trademark passes to the purchaser upon a sale and delivery of the newspaper, the plant, good-will and appurtenances to it.

2. ———: ———: **Use of Name.** There can be' no exclusive ownership of words constituting a trademark, unless they are used to designate a vendible commodity; nor unless the words be affixed to the vendible commodity for a sufficient length of time to acquire currency and reputation as the mark of that commodity.

3. ———: ———: **Unfair Competition.** The law of fair trade requires that one man shall not palm off his wares as those of another for two reasons: (1) where one man has established a reputation for his wares the law will protect him against such unfair competition, (2) the public must be protected against one selling one commodity to people who buy believing it to be another.

4. ———: ———: ———: **Clean Hands.** Where the purchaser of a newspaper, with good-will, name and appurtenances, merged it with another newspaper owned by him and discontinued the name of the purchased paper, he could not restrain by injunction the seller from publishing a paper under a name similar

to the one discontinued, on the ground that such publication was unfair.competition; plaintiff did not come into equity with clean hands in that his business, with which the other competed, was fraudulent because it was patronage sought under the name of the paper which he had discontinued.

Appeal from St. Louis City Circuit Court.—*Hon. Walter B. Douglas,* Judge.

AFFIRMED.

*Joseph A. Wright* and *E. E. Schnepp* for appellant.

(1)  Equitable jurisdiction, to restrain unfair competition, though of recent origin, is clearly established; its principles originated in the technical law of trademark, and these principles have been expanded to meet modern commercial conditions.   Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169; Lawrence Mfg. Co. v. Tenn. Mfg. Co., 138 U. S. 537; Fairbank Co. v. Soap Co., 102 Fed. 327; G. W. Cole Co. v. American Cement Co., 130 Fed. 703; Dennison Mfg. Co. v. Thomas Mfg. Co., 9 Fed. 651; Church and Dwight Co. v. Russ, 99 Fed. 276; Walter Baker & Co. v. Sanders, 80 Fed. 889; Tobacco Co. v. Tobacco Co., 104 Mo. 53; Tobacco Co. v. Tobacco Co., 52 Mo. App. 10; Sanders v. Utt, 16 Mo. App. 322; Sanders v. Jacob, 20 Mo. App. 96; Sartor v. Schaden, 125 Iowa 696; Amusement Co. v. Frohman, 202 Ill. 541; Stationery Co. v. Dodge, 145 Cal. 380; Watch Co. v. Watch Co., 173 Mass. 85; Wagon Co. v. La Belle Wks., 82 Wis. 546; Kyle v. Perfection Co., 127 Ala. 39.   (2) The right to injunctive relief arises from deception of the public through the efforts of the offending party to reap the benefits properly inuring to the aggrieved party through the latter's efforts to build up a business in which the public have come to repose confidence.   Therefore, in contradistinction to the technical law of trademark, no proprietary interest in the words or in their exclusive use need be averred or proven.   Shaver v. Hel-

ler & Merz Co., 108 Fed. 821; Coats v. Merrick Thread Co., 149 U. S. 562; Watch Co. v. Watch Case Co., 179 U. S. 665. (3) A property right in the name of a newspaper may be both acquired and transferred, and is subject to the same protection against abuse from unfair competition as the manufacture and sale of specific articles of commerce. Lane v. Smythe, 46 N. J. Eq. 443; Metropolitan National Co. v. St. Louis Dispatch Co., 149 U. S. 436; Menendez v. Holt, 128 U. S. 514; People ex rel. v. Roberts, 159 N. Y. 70; Lawrence v. Times Printing Co., 22 Wash. 482; Gannert v. Rupert, 127 Fed. 962; Peltz v. Eichele, 62 Mo. 171; Tuttle v. Blow, 176 Mo. 158; Publishing Co. v. Publishing Co., 25 Hun 398; Sebastian on Trademarks, p. 291; Hopkins on Unfair Trade, chap. 4, pp. 115-121. (4) The uninterrupted use of a tradename is not necessary to restrain unfair competition. If the benefits continue to inure to the aggrieved party or if the tradename has been discontinued without express intention of abandonment, an injunction will lie. Abandonment is an affirmative defense, and therefore cannot avail the defendant, upon demurrer to petition. Janny v. Pan-Coast Ventilator & Mfg. Co., 128 Fed. 121; Saxlender v. Eisner & Mendelson Co., 179 U. S. 19; Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169; Mouson & Co. v. Boehm, 26 Ch. Div. 398; Burt v. Tucker, 178 Mass. 493; Grow v. Seligman, 47 Mich. 607; Nolan Bros. Shoe Co. v. Nolan, 131 Cal. 271; Julian v. Hoosier Drill Co., 78 Ind. 408; Bank v. Warren, 94 Wis. 151; Browne on Trademarks, 654, 655; 28 Am. & Eng. Ency. of Law (2 Ed.), 396, 397; Hopkins on Trademarks, Tradenames and Unfair Competition, p. 218.

*Frank K. Ryan* for respondent.

(1) The petition herein is fatally defective in that it does not state facts sufficient to constitute a cause of action, because it shows that the name, or trademark, as to which appellant claims infringement, viz., "St.

Louis Grocer and General Merchant," is not used by it upon any vendible commodity, and that appellant's use of such name is merely as an advertisement to get business for the newspaper which it does publish, viz., the "Interstate Grocer." McAndrews v. Basset, 4 De G. J. & S. 380; Dixon Crucible Co. v. Guggenheim, 2 Brewst. 324; Samuel v. Berger, 24 Barb. 163; Skinner v. Oakes, 10 Mo. App. 56, 61; In re Siaezey, 62 How. Pr. 215; Mayer v. Flanagan, 12 Tex. Civ. App. 405; Pharmacal Co. v. Denver Chem. Mfg. Co., 51 C. C. A. 465, 475; Brown on Trademarks, secs. 129, 130, 301, 302 and cases cited; Paul on Trademarks, secs. 58, 136, 160. (2) The name "St. Louis Grocer and General Merchant" having been abandoned in 1903, when appellant acquired from Lee and Schulte the paper which they had published under that name, and which paper appellant says was then "merged in" and "became a part of" the "Interstate Grocer," injunction will not now lie to restrain appellee from using such name so abandoned by appellant. Lea v. Miller, No. 513 Cox's Trademark Cases; Medicine Co. v. Wood, No. 628 Cox's Trademark Cases. (3) Appellant, by using the name "St. Louis Grocer and General Merchant" with "advertising agencies" and otherwise to procure business for his paper, the "Interstate Grocer," or by using such name as the name of a paper which it does not publish and which is not published by anybody, commits such a fraud that it has no standing in a court of equity to ask the court's protection in its use of such a name. Medicine Co. v. Wood, 108 U. S. 218, 227; Fetridge v. Wills, 4 Abbott (N. Y.) 144; Cloth Co. v. Cloth Co., 4 De G. J. & S. 137; Alaska Pkr's Assn. v. Alaska Mer. Co., 60 Fed. 103; New York Con. Card Co. v. Union Playing Card Co., 39 Hun 611; Hazard v. Cornell, 93 N. Y. 259; Krauss v. Peebles, 58 Fed. 585; Palmer v. Hanes, 50 Ohio St. 156; Prince Mfg. Co. v. Paint Co. (N. Y. Ct. App.), 31 N. E. 990;

Connell v. Reed, 128 Mass. 477; Uri v. Hirsch, 123 Fed. 568.

NORTONI, J.—The suit is in equity, seeking to restrain the defendant from an alleged unfair competition with the plaintiff in the publication of a trade newspaper or journal. The circuit court sustained a demurrer to the plaintiff's bill and it appeals.

Plaintiff and defendant are each corporations engaged in the business of publishing trade journals to the grocery trade in the city of St. Louis and the territory tributary thereto. The material facts alleged in the bill are, the plaintiff now owns and publishes, and has for a number of years published its trade paper known as the "Interstate Grocer." About February, 1901, another corporation, the "Grocer Publishing Company" published, in the interest of the grocer trade at St. Louis, a journal styled and known as the "St. Louis Grocer and General Merchant," which paper was also known to the trade as "Grocer and General Merchant," and the same had a large and extensive circulation. On the ―――― day of February, 1901, the said Grocer Publishing Company sold to this plaintiff its said paper, the St. Louis Grocer and General Merchant, and the good-will thereof, postal franchises, contracts, mailing lists, type and equipment, etc., and said Grocer Publishing Company agreed that it would no longer publish the St. Louis Grocer and General Merchant or any other like publication. After plaintiff had thus acquired the said St. Louis Grocer and General Merchant and all things appurtenant thereto, it, the plaintiff, entered into a business arrangement with two of its directors and officers, to-wit: George J. Schulte and John A. Lee, for a continuance of the publication of said journal, the St. Louis Grocer and General Merchant, and under this arrangement, the publication thereof was continued by said Schulte and Lee under

the firm name of Schulte & Company, for a period of two and one-half years, to July 1, 1903, and during that time it had a large, extensive and valuable circulation and patronage in advertisements, etc., in St. Louis and throughout the United States. About July 1, 1903, George J. Schulte and John A. Lee transferred to the plaintiff the said business conducted by them as partners under the firm name of Schulte & Company and also transferred and merged in the plaintiff, the said St. Louis Grocer and General Merchant, its postal franchises, name and good-will, contracts, mailing lists, and other property of said partnership employed in the publication of said St. Louis Grocer and General Merchant by said Schulte and Lee, and thereupon said St. Louis Grocer and General Merchant merged in and became a part of the plaintiff's trade journal, "The Interstate Grocer." Thereupon the publication of the St. Louis Grocer and General Merchant, under that name and title, by virtue of its said merger, suspended publication and the plaintiff's said journal, the Interstate Grocer has continued ever since such merger to be published weekly to the grocery trade, as it had been for many years theretofore. By virtue of the purchase and merger of the said St. Louis Grocer and General Merchant and the good-will and rights and privileges appurtenant thereto, a great advantage accrued to this plaintiff in the publication of its said paper, the Interstate Grocer, and since said merger, plaintiff has received and still continues to receive large quantities of mail matter addressed to the "St. Louis Grocer and General Merchant," and "Grocer and General Merchant," and said St. Louis Grocer and General Merchant is now and has been at all times since said merger listed by plaintiff upon various lists of newspaper and advertising agencies, to the profit and advantage of plaintiff, in securing patronage for its said paper, the Interstate Grocer. About July 1, 1905, the defendant employed

one Robert E. Lee who had for several years theretofore been in the employ of plaintiff as editor of the Interstate Grocer, and on August 26, 1903, commenced the publication of a journal at St. Louis in the interests of the grocery trade, styled "Eli Grocer and General Merchant." Said paper, a weekly publication, is designed to and does reach the same class of subscribers and patrons, and its purpose is to the same end, and it is in all things a competitor of the plaintiff's said journal, the Interstate Grocer. At the time of selecting the name of Eli Grocer and General Merchant for said publication, the defendant's officers well knew of the rights and privileges theretofore acquired and possessed by plaintiff in the St. Louis Grocer and General Merchant and that said name of Eli Grocer and General Merchant was wilfully designed and adopted by defendant to embarrass plaintiff and to cause confusion in the grocery trade and among the subscribers and advertisers of plaintiff's said paper, the Interstate Grocer, and by deceiving the public, cause to flow to defendant patronage lawfully enjoyed by plaintiff through acquiring the good-will, property and the name of the St. Louis Grocer and General Merchant as aforesaid; and because of the similarity of the name of defendant's publication, the Eli Grocer and General Merchant with that of the St. Louis Grocer and General Merchant, defendant has deceived the public, introduced confusion and deprived this plaintiff of a large number of subscribers and advertising patrons and a large volume of legitimate business; that said names, the Eli Grocer and General Merchant and the St. Louis Grocer and General Merchant, are similar and will continue to confuse and deceive advertisers, subscribers and readers in the field where the Interstate Grocer and the Eli Grocer and General. Merchant are now being circulated, greatly to the injury and damage of the plaintiff, and will continue in the future as it has in the past to de-

prive plaintiff of a large number of its subscribers and a large volume of its advertising patronage, and unless the defendant be restrained from so doing, it will continue the publication of its said trade paper under the name and style of the Eli Grocer and General Merchant, to the plaintiff's damage, and likewise mislead and impose upon the public as well. Wherefore plaintiff prays that the defendant be restrained and enjoined from a further publication of its said paper, etc. The bill concludes with a prayer for general relief.

1. An attentive reading of the bill discloses that the pleader predicates his cause upon the theory of unfair competition rather than upon that of infringement of a trademark. Notwithstanding this fact, however. learned counsel for defendant argues the suit is one for infringement of trademark, and in support of this argument, insists that the title or name of a publication, such as that mentioned in the bill, is a trademark pure and simple, and the demurrer was properly sustained for the reason there can be no proprietary interest in a trademark separate and apart from the commodity, the ownership or manufacture of which it points. There seems to be doubt expressed in a number of cases as to whether or not the name of a periodical or newspaper is a trademark, and the right to technical trademark in such titles has been affirmed and denied, says Mr. Hopkins, with some show of reason upon each side. However that may be, it seems now settled and the more enlightened opinions concur on the proposition that the right of technical trademark exists in the title to newspaper and periodicals. A very recent case on the subject is Gannert v. Rupert, 127 Fed. 962, 62 C. C. A. 594, where it is pointedly held that the name of the periodical "Comfort" was a trademark. Other cases in point are Matsill v. Flanagan, 2 Abb. Pr. (n. s.) 459; Dixon Crucible Co. v. Guggenheim, 2 Brewster, 321; Clement v. Maddick, 1 Griff. 98. After reviewing

the authorities on this question, Mr. Browne expresses the opinion that a name so used is a technical trademark, as follows:

"From the foregoing train of reasoning, we deduce this conclusion. A newspaper, being a vendible article, is as much a matter of merchandise as anything can be. It would not be bought unless it contained or bore an authenticating sign. That sign is its name. Each issue may be ephemeral, and be at once consumed; but the name, its emblem, is permanent and invariable, and is the stamp of genuineness. We see, therefore, that the Office was unquestionably right in admitting the name of a newspaper to registration as a trademark." [Browne on Trademarks (2 Ed.), sec. 115.]

Mr. Hopkins agrees with the view of Mr. Browne on the subject and expresses the same opinion. See Hopkins on Trademarks (2 Ed.), sec. 73; see also Sebastian on Trademarks, 296; Paul on Trademarks, sec. 58; 28 Amer. & Eng. Ency. Law (2 Ed.), 383, 384.] Under the authorities cited, the title, St. Louis Grocer and General Merchant, is no doubt a trademark to which the plaintiff succeeded upon the sale and delivery to it of the entire newspaper, the name and good-will thereof, the plant and all things appertaining thereto having been transferred to it at the time, as is well settled. [Skinner v. Oaks, 10 Mo. App. 45; McMahan Pharmacal Co. v. Denver Chemical Co., 51 Fed. 302; Lane v. Smythe, 46 N. J. Eq. 443.]

Now looking to the allegations of the bill, we find that plaintiff first purchased the St. Louis Grocer and General Merchant, subscription lists, contracts, the good-will, the name, the plant and all things appertaining thereto, February 1, 1901, and thereafter, under some business arrangement satisfactory to it, placed the same in charge of a copartnership consisting of George

J. Schulte and John A. Lee, operating under the name of Schulte & Company, who conducted the paper for two and one-half years. On July 1, 1903, Schulte & Company assigned, sold and transferred their entire interest in the same and its name, the St. Louis Grocer and General Merchant, the good-will thereof, subscription lists, contracts, plant and all things appurtenant thereto to the plaintiff, by which transfer to plaintiff it is alleged the St. Louis Grocer and General Merchant, the good-will and the name thereof, were merged in the Interstate Grocer, then owned and conducted by the plaintiff. While the allegation is that the St. Louis Grocer and General Merchant was merged in the Interstate Grocer, it is patent from other allegations in the bill that the name or trademark, the St. Louis Grocer and General Merchant, was not hyphenated or combined in any manner whatever with plaintiff's paper, the Interstate Grocer, which had for many years occupied the field, and so continued under the name of Interstate Grocer. It does appear affirmatively, however, from the allegations of the bill, that instead of hyphenating the title, St. Louis Grocer and General Merchant, with the Interstate Grocer, plaintiff discontinued the publication under the name of St. Louis Grocer and General Merchant, and listed the name, St. Louis Grocer and General Merchant, severed from the entity of a live, going newspaper, with various advertising agencies, soliciting advertising and other patronage therefor as though the paper, under that title, was still a going concern and being issued to the trade weekly.

Now this being true, it is argued by defendant the demurrer was properly sustained for the reason no trademark can exist in a name which is entirely disassociated from the goods or commodity, the origin, ownership or manufacture of which it has served to point; or in other words, no trademark can exist in the name or

title to this newspaper disassociated from the paper for two years after the merger with the Interstate Grocer unless the plaintiff had, by hyphenating or otherwise, continued the use of the name with some paper at least. In short, that plaintiff could have no trademark and no proprietary interest in the mere words or title "St. Louis Grocer and General Merchant" sufficient to support this action, severed as it was from any going publication, under the circumstances stated. And indeed it is the law that there is not and can be no exclusive ownership of the words or symbol which constitute a trademark apart from the use or application of such words or symbol to a vendible commodity and in order for one person to have that proprietary interest which is always incident to technical trademark, sufficient to support an action looking to the protection of this property right, the mark must be stamped or otherwise affixed to a vendible commodity or thing actually in the market for a sufficient length of time at least to have obtained currency, acceptance and reputation under and associated with the mark which points or otherwise identifies its origin, ownership or manufacture. [McAndrews v. Bassett, 4 De Gex, J. & S. 380; Browne on Trademarks (2 Ed.), secs. 129, 130, 301, 302; McMahan Phar. Co. v. Denver Chem. Co., 51 Fed. 302.]

It therefore appears that were the case in all respects to be governed by the technical rules of the ancient law of trademarks, the judgment sustaining the demurrer should be affirmed upon the proposition that although the name or title of the paper be a trademark, no sufficient property interest in the words is vested in the plaintiff to support the action inasmuch as those words had for more than two years been entirely disassociated from the newspaper or vendible commodity in the market. However this may be, we find that in keeping with the Christian influence of advancing civilization, the courts have evolved out of the technical law

of trademarks a just doctrine, well-founded, and known
as the law of unfair trade, the underlying principle of
which is not only sound and broad but eminently more
concerned with the justice of the cause than was our
ancient jurisprudence with reference to infringements
of the trademark. Now the broad principle, fundamen-
tal of the doctrine incorporated in 'the law of unfair
competition, is that irrespective of the proprietary in-
terest in the word or symbol which constitutes the
trademark, and for that matter, irrespective of the en-
tire question of technical trademark, one man has no
right to palm off his goods or wares as those of another.
This is true for two very sufficient reasons. First, a
man who has established a reputation for his goods, by
the excellence of his product, under a given mark or
symbol indicating its origin or manufacture, is by all
means entitled to be protected in the enjoyment of the
good-will, of the fruits and the reputation of the busi-
ness thus established by his uprightness, integrity and
industry; and second, on the other hand, those members
of the public who purchase a commodity are of right
entitled to have precisely what they purchase and to this
end should be protected against the fraud and deceit of
whomsoever places another and different or counterfeit
article upon the market under a mark or symbol in the
similitude, likeness, or in the dress of the genuine. [El-
gin, etc., Watch Co. v. Illinois, etc., Watch Co., 179 U.
S. 665-674; Coates v. Merrick Thread Co., 149 U. S.
562-566; Shaver v. Heller & Mertz Co., 108 Fed. 821-
826; McLean v. Fleming, 96 U. S. 245; 28 Amer. & Eng.
Ency. Law (2 Ed.), 345 to 350; Browne on Trademarks
(2 Ed.), sec. 43.]

It is upon this doctrine the present action is
founded, the gist of the complaint being that defend-
ants, by establishing and publishing their paper, the
Eli Grocer and General Merchant, impinged the prin-
ciple referred to by employing the words "Grocer and

General Merchant" in its title so as to sell it in the newspaper field to, and obtain advertising patronage from, persons who believe they were in fact patronizing the St. Louis Grocer and General Merchant, and that the paper of defendant is palmed off on unsuspecting patrons under colorable imitation of the St. Louis Grocer and General Merchant to the plaintiff's detriment by consequent loss of patronage, and the public are likewise deceived, defrauded and imposed upon thereby.

2. There is a second and sufficient proposition in the case, however, appearing affirmatively on the face of the bill which, in our opinion, amply justified the court in sustaining the demurrer. It appears that about July 1, 1903, plaintiff succeeded to the rights of the partnership of George J. Schulte & Company and merged the entire business and equipment of the St. Louis Grocer and General Merchant in the plaintiff's paper, the Interstate Grocer; that is to say, the newspaper plant, type, printing outfit, etc., etc., of the St. Louis Grocer and General Merchant, were taken over and became a part of the printing office of the Interstate Grocer and the advertising contracts, subscription lists, etc., outstanding against the St. Louis Grocer and General Merchant, were merged in the business of the Interstate Grocer and fulfilled by it under its name and title, Interstate Grocer. It appearing that the equipment of the St. Louis Grocer and General Merchant, its contracts and business were taken over and, as alleged, merged in the Interstate Grocer without hyphenating or in any manner combining all or any portion of the name, St. Louis Grocer and General Merchant with the name of plaintiff's paper, the question naturally arises; what became of the name or title of the St. Louis Grocer and General Merchant after the newspaper, which, prior to that date, it identified, had suspended publication under its former name by virtue of

its merger with the Interstate Grocer? The bill point-
edly answers to the effect that the plaintiff, although
the newspaper under that name and title had actually
quit the field, continued its claim to the title, St.
Louis Grocer and General Merchant, and actually listed
it with newspaper and advertising agencies as the name
or title of a live, going publication for which, by thus
listing, plaintiff constantly sought the advertising pat-
ronage of the public, etc., for two years after the paper
had ceased to exist and until the filing of this suit. Or,
in other words, plaintiff employed the name, St. Louis
Grocer and General Merchant, by so listing the same
and soliciting patronage for a publication no longer ex-
tant, as a decoy to induce patronage which it diverted
to its paper, the Interstate Grocer, and in this state of
the case, it appears plaintiff comes into a court of con-
science and seeks injunctive relief against defendants
employing the words "Grocer and General Merchant"
in the title of a newspaper which defendant actually
publishes, on the ground it is an unfair competition
with a newspaper which it, the plaintiff, does not pub-
lish, but the name of which it has employed for two
years past as a decoy with which to deceive the public
into believing that such publication still exists and is
published weekly to the grocery trade in the city of
St. Louis and the territory tributary thereto. It is
indeed fundamental in equity jurisprudence that he
who comes into a court of conscience for relief must
come with clean hands and a clear conscience, and it
is certain that even though the plaintiff may be sub-
jected to the operations of an unfair competition, nev-
ertheless if it appears that plaintiff seeks injunctive re-
lief to restrain such operations for an unfair purpose
himself; or, in other words, if it appears, as in this
case, that plaintiff seeks the process of equity to enable
it to continue deceiving the public by listing the name

127 App—24

of a defunct paper and thus soliciting patronage for a suspended publication as a live, going newspaper, the relief will be denied on the broad principle that he who seeks equity must do equity, for a court of conscience will decline to award or protect a privilege of deceiving the public. Authorities are numerous. [Leather Cloth Co., Ltd., v. American Leather Cloth Co., Ltd., 4 De Gex, J. & S. 137; Manhattan Med. Co. v. Wood, 108 U. S. 218; Fetridge v. Wells, 4 Abb. Pr. 144; Connell v. Reed, 128 Mass. 477; N. Y. Consolidated Card Co. v. Union Playing Card Co., 46 Hun (N. Y.) 611; Uri v. Hirsch, 123 Fed. 568; Krauss v. Peebles' Sons, 58 Fed. 585; Hazard v. Caswell, 93 N. Y. 259; Alaska Packers Assn. v. Alaska Imp. Co., 60 Fed. 103; Prince M'fg. Co. v. Prince Metallic Paint Co. (N. Y. App.), 31 N. E. 990.]

The principle above discussed is familiar. We have been unable to find any Missouri trademark or unfair competition cases where like questions are involved, and it therefore may not be out of place to call attention to some of the leading cases and the application of the principle referred to by the most eminent courts.

In Manhattan Medicine Co. v. Wood, 108 U. S. 218, one Moses Atwood of Georgetown, Massachusetts, had compounded, manufactured and sold a valuable medicine under the trademark of "Atwood's Genuine Physical Jaundice Bitters. Georgetown, Mass." The remedy had achieved quite an extensive reputation. The trademark quoted was blown into the glass bottles containing the medicine. Plaintiff, a New York corporation, purchased the business, recipe and trademark, from Atwood, with the right to continue the use of the trademark, and removed the same to the city of New York and there continued the manufacture and sale of the remedy as being manufactured by Atwood at Georgetown, Massachusetts. The defendants, who lived in the State of Maine, prepared and placed upon the

market an imitation of the medicine under the same name and designation, thereby deceiving the public. The plaintiff, the New York company, brought its bill in equity to enjoin defendants from further placing upon the market the imitation of their medicine under the plaintiff's trademark. The Supreme Court of the United States applied the principle above referred to and denied the injunctive relief prayed for on the ground that the representations of plaintiff to the effect that the remedy made by it in New York under the Atwood recipe, was made in Georgetown, Massachusetts, by Moses Atwood, was a fraud upon the public which the court would not lend its aid to protect however great the fraud being perpetrated upon the plaintiff and the public by the defendant's imitation remedy manufactured in Maine under the plaintiff's trademark. Mr. Justice FIELD, who delivered the opinion of the court, remarked: "It is not honest to state that the medicine is manufactured by Moses Atwood at Georgetown, Massachusetts, when it is manufactured by the Manhattan Medicine Company in the city of New York." A number of the leading cases are reviewed in that case by the learned Justice, as follows:

"This doctrine is illustrated and asserted in the case of The Leather Cloth Company (Limited) v. The American Leather Cloth Company (Limited) which was elaborately considered by Lord Chancellor Westbury, and afterwards in the House of Lords on appeal from his decree. [4 De G. J. & S. 137, and 11 House of Lords' Cases, 523.]

"In that case an injunction was asked to restrain the defendant from using a trademark to designate leather cloth manufactured by it, which trademark the complainant claimed to own. The article known as leather cloth was an American invention, and was originally manufactured by J. R. & C. P. Crockett, at Newark, New Jersey. Agents of theirs sold the article in

England as "Crockett's Leather Cloth." Afterwards a company was formed entitled "The Crockett International Leather Cloth Company," and the business previously carried on by the Crocketts was transferred to this company, which carried on business at Newark, in America, as a chartered company, and at West Ham, in England, as a partnership. In 1856, one Dedge took out a patent in England for tanning leather cloth and transferred it to this company. In 1857 the complainant company was incorporated, and the international company sold and assigned to it the business carried on at West Ham, together with the letters patent, and full authority to use the trademark which had been previously used by it in England. A small part of the leather cloth manufactured by the complainant company was tanned or patented. It, however, used a label which represented that the articles stamped with it were the goods of the Crockett International Leather Cloth Company; that they were manufactured by J. R. & C. P. Crockett; that they were tanned leather cloth; that they were patented by a patent obtained in 1856, and were made either in the United States or at West Ham, in England. Each of these statements or representations was untrue so far as they applied to the goods made and sold by the complainant.

"The defendant having used on goods manufactured by it a mark having some resemblance to that used by the complainant, the latter brought suit to enjoin the use. Vice-Chancellor Wood granted the injunction, but on appeal to the Lord Chancellor the decree was reversed and the bill dismissed. In giving his decision the Lord Chancellor said that the exclusive right to use a trademark with respect to a vendible commodity is rightly called property; that the jurisdiction of the court in the protection of trademarks rests upon property and that the court interferes by injunction because that is the only mode by which property of that descrip-

tion can be effectually protected. But he added: 'When the owner of the trademark applies for an injunction to restrain the defendant from injuring his property by making false representations to the public, it is essential that the plaintiff should not in his trademark, or in the business connected with it, be himself guilty of any false or misleading representation; for if the plaintiff makes any material false statement in connection with the property he seeks to protect, he loses, and very justly, his right to claim the assistance of a court of equity.' And again: 'Where a symbol or label, claimed as a trademark, is so constructed or worded as to make or contain a distinct assertion which is false, I think no property can be claimed in it, or, in other words, the right to the exclusive use of it cannot be maintained.'

"When the case reached the House of Lords the correctness of this doctrine was recognized by Lord Cranworth, who said that of the justice of the principle no one could doubt; that it is founded in honesty and good sense, and rests on authority as well as on principle, although the decision of the House was placed on another ground.

"The soundness of the doctrine declared by the Lord Chancellor has been recognized in numerous cases. Indeed, it is but an application of the common maxim that he who seeks equity must present himself in court with clean hands. If his case discloses fraud or deception or misrepresentation on his part, relief there will be denied.

"Long before the case cited was before the courts, this doctrine was applied when protection was sought in the use of trademarks. In Pidding v. How, 8 Simmons 477, which was before Vice-Chancellor Shadwell in 1837, it appeared that the complainant was engaged in selling a mixed tea, composed of different kinds of black tea, under the name of 'Howqua's Mixture,' in

packages having on three of their sides a printed label with those words. The defendant having sold tea under the same name, and in packages with similar labels, the complainant applied for an injunction to restrain him from so doing. An ex parte injunction, granted in the first instance, was dissolved, it appearing that the complainant had made false statements to the public as to the teas of which his mixture was composed, and as to the mode in which they were procured. 'It is a clear rule,' said the Vice-Chancellor, 'laid down by courts of equity, not to extend their protection to persons whose case is not founded in truth.'

"In Perry v. Truefitt, 6 Beav. 66, which was before Lord Langdale, master of the rolls, in 1842, a similar ruling was had. There it appeared that one Leathart had invented a mixture for the hair, the secret and recipe for mixing which he had conveyed to the plaintiff, a hair-dresser and perfumer, who gave to the composition the name of 'Medicated Mexican Balm' and sold it as 'Perry's Medicated Mexican Balm.' The defendant, one Truefitt, a rival hair-dresser and perfumer, commenced selling a composition similar to that of plaintiff, in bottles with labels closely resembling those used by him. He designated his composition and sold it as 'Truefitt's Medicated Mexican Balm.' The plaintiff thereupon filed his bill, alleging that the name or designation of 'Medicated Mexican Balm' had become of great value to him as his trademark, and seeking to restrain the defendant from its use. It appeared however, that the plaintiff, in his advertisements to the public, had falsely set forth that the composition was 'a highly concentrated extract from vegetable balsamic productions of Mexico, and was prepared from 'an original recipe of the learned J. F. Von Blumenbach, and was recently presented to the proprietor by a very near relation of that illustrious physiologist;' and the court, therefore, refused the injunction, the master of the rolls

holding that, in the face of such misrepresentation, the court would not interpose in the first instance, citing with approval the decision in the case of Pidding v. How.

"In a case in the Superior Court in the city of New York—Fetridge v. Wells, 4 Abbott (N. Y.) 144—this subject was very elaborately and ably treated by Chief Justice Duer. The plaintiff there had purchased a recipe for making a certain cosmetic, which he sold under the name of 'The Balm of a Thousand Flowers.' The defendants commenced the manufacture and sale of a similar article, which they called 'The Balm of Ten Thousand Flowers.' The complainant, claiming the name used by him as a trademark, brought suit to enjoin the defendants in the alleged infringement upon his rights. A temporary injunction was granted, but afterwards, upon the coming in of the proofs, it was dissolved. It appeared that the main ingredients of the compound were oil, ashes and alcohol, and not an extract or distillation from flowers. Instead of being a balm, the compound was a soap. The court said it was evident that the name was given to it and used to deceive the public, to attract and impose upon purchasers; that no representation could be more material than that of the ingredients of a compound recommended and sold as a medicine; that there was none so likely to induce confidence in its use, and none when false, that would more probably be attended with injurious consequences. And it also said: 'Those who come into a court of equity, seeking equity, must come with pure hands and a pure conscience. If they claim relief against the frauds of others, they must themselves be free from the imputation. If the sales made by the plaintiff and his firm are effected, or sought to be, by misrepresentation and falsehood, they cannot be listened to when they complain that, by the fraudulent rivalry of others their own fraudulent profits are diminished. An exclusive privi-

lege for deceiving the public is assuredly not one that a court of equity can be required to aid or sanction. To do so would be to forfeit its name and character.' "

Other cases to the same effect are Uri v. Hirsch, 123 Fed. 568, and Connell et al. v. Reed, 128 Mass. 477.

In Uri v. Hirsch, plaintiff, by bill, sought an injunction for infringement of a trademark for whiskey. The testimony and exhibits of complainant showed that his trademark, as registered and shown by his barrels and bottles contained the representation that his whiskey was made in Nelson county, Kentucky, that in his advertising matter, he used cuts of a distillery, with the words quoted: "Old Style Nelson County Pure Rye." It was shown without contradiction that he owned no distillery; that the whiskey purchased by him was purchased from rectifiers and not made in Kentucky; was not a pure rye or bourbon as represented, but a blended whiskey flavored and containing coloring matter, his trademark being stenciled on the barrels at his request. Held, that both his trademark and business being founded on false representations intended to deceive the public, a court of equity would not entertain a suit for their protection.

In Connell v. Reed, the court adjudged that as the plaintiff had adopted the words in his trademark to denote and to indicate to the public that the medicines being sold by him were used in the East Indies and that the formula for them was obtained there and that these representations were false, he could not maintain a bill in equity to restrain an infringement of such a trademark.

In the language of Justice FIELD, we can say "it is not honest" for the plaintiff to list the name, St. Louis Grocer and General Merchant, with the newspaper and advertising agencies and thereby solicit patronage for that paper as a going publication after it has in fact passed out of existence, and a continuation of the prac-

tice could only work deception and fraud upon the public. This a court of equity will neither aid nor condone. The case is not one for equitable relief and the learned trial judge very properly so declared in sustaining the demurrer.

The judgment will be affirmed. It is so ordered. All concur.