**A.B. CHANCE COMPANY, Respondent,**

v.

**Mark A. SCHMIDT, Appellant.**

**No. WD 37545.**

Missouri Court of Appeals,
Western District.

Sept. 16, 1986.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Nov. 4, 1986.

Application to Transfer Denied
Dec. 16, 1986.

Louis J. Leonatti, Ann P. Hagan, Seigfreid, Runge, Leonatti & Pohlmeyer, P.C., Mexico, for appellant.

Warren N. Williams, Schmidt, Johnson, Hovey & Williams, Paul D. Lamoree, Watson, Ess, Marshall & Enggas, Kansas City, James T. Ausmus, Ausmus, Ausmus, & Beck, Centralia, for respondent.

Before SHANGLER, P.J., and DIXON and LOWENSTEIN, JJ.

LOWENSTEIN, Judge.

As a former employee of the Chance Company (Chance) Schmidt appeals an injunction restraining him from divulging trade secrets of Chance. The parties agree that the order issued after hearing on the temporary injunction would be repeated for the permanent injunction and is final for purposes of appeal. *Pomirko v. Sayad*, 693 S.W.2d 323, 325 (Mo.App.1985). Rule 92.02.

The plaintiff, the A.B. Chance Company (Chance) of Centralia, makes epoxy resin rods and tubes reinforced with fiberglass. These "FRP" rods are manufactured by a special procedure and these products are designed primarily for use as tools for workmen in the handling of "hot" electrical wires. The plaintiff has developed this unique and complicated process called "pultrusion." Chance makes numerous other similar products utilizing pultrusion. Chance asserts much time and over a million dollars were spent to develop the process.

The defendant, a draftsman with 2 years of college, was employed by Chance for eleven years. Since 1980, he spent much time in the development, design and manufacture of the tubes and rods. Schmidt became familiar with the pultrusion process during his employment with Chance. After searching for a new job for some time, he resigned from Chance in early January 1985 to take a position with Hastings Fiber Glass Products, Inc. (Hastings) a competitor of Chance. Hastings, located

in Michigan did not and still does not possess the process utilized by Chance. Chance instituted this suit to prevent Schmidt from divulging confidential information and trade secrets to Hastings. This opinion will not go into great detail on the pultrusion process which is highly technical in nature. Further, this court, as did the trial court, entered a protective order restricting access to this file and the evidence pertaining to the confidential pultrusion process. The development and production of tools using pultrusion was in a limited access portion of Chance's premises.

Mr. Schmidt, upon starting work in 1973 signed an agreement with Chance which is now set out:

(10) EMPLOYEE acknowledges that the COMPANY regards and treats information relating to its inventions, designs, processes, production techniques, testing procedures and internal affairs generally, for example but not by way of limitation, its drawings, specifications, formulations, test methods and data, cost data, customer and supplier lists and computer programs, unless and until disclosed to the public by the COMPANY in issued patents or otherwise, as confidential and proprietary information in the nature of trade secrets; and EMPLOYEE agrees that he will not, either during the term of his employment by the COMPANY or thereafter, directly or indirectly, use or reveal any of such confidential information of the COMPANY to any subsequent employer or other unauthorized person.

Chance brought this suit to restrain Schmidt from tortiously misappropriating confidential information and trade secrets he acquired at Chance, from breaching the above contract provision and from unfair competition.

Based on the following findings the circuit court enjoined Schmidt from engaging in the pultrusion of rods and poles until February 4, 1990.

Chance controls between 70% and 100% of the market for the products in question (hot line tools, ladders, conductor supports, pole and insulating devices made by the pultrusion process). Yearly sales of these products are in excess of $10 million. A walled off portion of Chance's plant is devoted to this production. Admittance to this area is restricted. Specifications, and production records as to these tools are confidentially maintained. Not only are the products unique, but the manufacture is quite different and highly complicated. Total research and development costs were in excess of $1.3 million. Chance obtained certain patents in 1965 and 1969 that do not disclose the pultrusion process. The Company had diligently sought to keep proprietary and confidential all the information it discovered. At most only one other company in the United States even comes close to duplicating the pultrusion process as developed by Chance. Schmidt's new employer Hastings is a direct competitor with Chance on sale of the tools and equipment in question. Hastings has a different method of production and makes a product with different qualities. The Chance method of pultrusion is more efficient and safer than Hastings "pre-preg" method.

Between 1980 and 1985 Schmidt became totally familiar with the pultrusion method during his employment with Chance. During this time period Schmidt was given unlimited access to the development of the pultrusion process. When he was job hunting in late 1984 he emphasized his knowledge and experience with the pultrusion process. Schmidt's resume was accompanied by a cover letter to prospective employers which stated he had, ". . . considerable amount of experience in design of FRP products, processes and machinery. I feel that my qualifications could benefit your company with your present products, processes and in your research and development." His resume made numerous reference to his work on the design and development of seamless pultrusion lines and poles while with Chance. Hastings paid Schmidt more money than did Chance, and provided for additional compensation increments for his guaranteed three years of contract tenure. The three year employ-

ment contract resulted from Schmidt's insistence. Hastings had earlier balked at hiring him because Schmidt did not have a college degree in engineering. Schmidt's trial testimony about his work duties with Hastings was vague—he claimed that his confidentiality agreement with Hastings prevented him from discussing the specifics of the new job. He did say that during his job interview an executive of Hastings discussed Schmidt's experience with pultrusion. He acknowledged he was advised prior to leaving Chance of the non-disclosure aspects of their contract.

This suit was commenced prior to Schmidt's starting work with Hastings. The trial court concluded under comment b of the Restatement of Torts § 757, Chance's processes were protectable trade secrets. It determined that injunctive relief was appropriate because irreparable harm would likely occur from the imminent danger of Schmidt's disclosure to Hastings of the Chance trade secrets. The injunction issued to prevent Schmidt from disclosing the pultrusion trade secrets to his employer Hastings until February 4, 1990. This judgment translates to a restriction covering the first five years of Schmidt's employment with Hastings. On appeal Schmidt raises the following issues: 1) pultrusion was not a trade secret; 2) there was no evidence of disclosure of any secret and Chance had an adequate remedy at law; 3) the injunction was overly broad in that it referred to other documents and went beyond the contractual agreement; and, 4) he was improperly denied attorney fees.

 The review of the circuit court's action is prescribed under *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976), its findings on the evidence given due regard for having the opportunity to judge the credibility of the witnesses. Rule 73.-01(c)(2); *St. Louis County v. St. Louis County Police Officers Association, Local 844,* 652 S.W.2d 142, 144 (Mo.App.1983). The issuance and terms of an injunction rest within the sound discretion of the trial court to shape and fashion relief, when

appropriate, based on the facts and equities of the case. *May Dept. Stores Co. v. County of St. Louis,* 607 S.W.2d 857, 870 (Mo.App.1980). Injunctive relief must be based on a real apprehension that future acts are not just threatened but in all probability will be committed. *Hudson v. School District of Kansas City,* 578 S.W.2d 301, 312 (Mo.App.1979).

 As a general rule, Missouri courts will grant equitable protection for an employer's interest in trade secrets. *Mo-Kan Central Recovery Co. v. Hedenkamp,* 671 S.W.2d 396, 399 (Mo.App.1984). A restrictive covenant on the employee's right to compete must be reasonable as necessary to protect the employer's legitimate interest, and reasonable as to time and geographic scope. *Orchard Containers Corp. v. Orchard,* 601 S.W.2d 299, 303 (Mo.App. 1980); *Continental Research Corporation v. Scholz,* 595 S.W.2d 396, 400 (Mo.App. 1980). Such assessment must be made in consideration of the surrounding circumstances which include the subject matter, the purpose served, the situation of the parties, the limits of the restraint and the specialization of the business venture. *Herrington v. Hall,* 624 S.W.2d 148, 151 (Mo.App.1981).

I.

The first point to be considered is Schmidt's challenge to pultrusion being protectable by Chance as a trade secret. The following language in *National Rejectors, Inc. v. Trieman,* 409 S.W.2d 1, 18–19 (Mo. banc 1966), is from comment b to § 757 Restatement of Torts:

b. Definition of trade secret. A *trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business,* and *which gives him* an opportunity to obtain an *advantage over competitors who do not know* or use *it. It may be* a formula for a chemical compound, *a process of manufacturing,* treating or preserving materials, a pattern for a machine or other device, or a list of customers. It differs from other

secret information in a business (see § 759) in that it is not simply information as to single or ephemeral events in the conduct of the business, as, for example, the amount or other terms of a secret bid for a contract or the salary of certain employees, or the security investments made or contemplated, or the date fixed for the announcement of a new policy or for bringing out a new model or the like. A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article. It may, however, relate to the sale of goods or to other operations in the business, such as a code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers, or a method of bookkeeping or other office management.

Secrecy. The *subject matter* of a trade secret *must be secret.* Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret. Substantially, a trade secret is known only in the particular business in which it is used. It is not requisite that only the proprietor of the business know it. He *may, without losing* his *protection, communicate* it *to employees* involved in its use. He may likewise communicate it to others pledged to secrecy. Others may also know of it independently, as, for example, when they have discovered the process or formula by independent invention and are keeping it secret. Nevertheless, a substantial element of secrecy must exist, so that, *except by the use of improper means*, there would be *difficulty in acquiring the information.* An exact definition of a trade secret is not possible. Some *factors* to be considered in determining whether given information is one's trade secret *are*: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. (Emphasis added.)

■ The evidence in this case overwhelmingly supported the trial court's conclusion that this process was a trade secret. The following facts seriously erode Schmidt's contentions on appeal of pultrusion not being unique or secret: 1) The employment agreement between them refers to the processes as being confidential, proprietary and in the nature of trade secrets; 2) the extensive Chance research took over 5 years and cost in excess of $1 million; 3) Chance controls between 70 and 100% of the pultrusion market; 4) Chance had restricted access to the pultrusion production; 5) the process is highly complicated, not susceptible of duplication; that access to this information was given to Schmidt under a veil of secrecy. *Syntex Ophthalmics, Inc. v. Novicky,* 745 F.2d 1423, 1433–4 (Fed.Cir.1984). In addition, during the temporary restraining order portion of this case, Schmidt agreed to not work in the area of pultrusion for Hastings, and his acquiescence at trial and on appeal to the file being sealed from the view of outsiders, indicated his tacit agreement that the pultrusion process is a trade secret. It is in fact a secret under the Restatement, and Chance has taken steps to keep the information confidential. *National Rejectors, supra,* at 22; *Arco Industries Corporation v. Chemcast Corporation,* 633 F.2d 435, 443 (6th Cir.1979). The process came after much research, was not easily copied, and the company took the effort by contract to keep employees from divulging the information. *Carboline Company v. Jarboe,* 454 S.W.2d 540, 542 (Mo.1970). *Sigma Chemical Company v. Harris,* 794 F.2d 371 (8th Cir.1986).

Chance has been able to obtain an ascendance and a definite advantage over potential competitors who manufacture similar products. *Id.* at 549; *Henry Hope X–Ray Products v. Marron Carrel, Inc.*, 674 F.2d 1336, 1341 (9th Cir.1982).

■ Whether or not an agreement existed, the manufacturer Chance had a common law right in the trade secrets imparted to the employee during a confidential relationship, and for which an injunction may issue. *Jerrold-Stephens Co. v. Gustaveson*, 138 F.Supp. 11, 15–16 (W.D.Mo.1956). The information was imparted to Schmidt who had an obligation to protect its confidentiality and the information was not otherwise publicly disclosed. *Ruckelshaus v. Monsanto Company*, 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984).

This point is denied.

## II.

■ As a further attack upon the injunction Schmidt says it goes beyond part (10) of the Agreement which was earlier described. He refers the court to several cases standing for the general proposition that a court may not enlarge the terms of a contract.

This argument runs counter to the facts here. The agreement contained no limitation on the time in which he could reveal the confidential information. The injunction here followed the law in this state in limiting the time period of restraint for no longer than the new employer could reproduce the information other than by the hiring of the new employee.

Rather than being more broad than the agreement the judgment here limited to five years the prohibition against Schmidt's passing on to Hastings the pultrusion process he learned at Chance. Schmidt is hardly in a position to complain where the agreement was more broad than the court's judgment.

■ The theme of this argument of the injunction running counter to the agreement has another flaw. It ignores the independent duty of an employee in a fiduciary relationship not to disclose confidential information or trade secrets. *Union Carbide Corporation v. UGI Corporation*, 731 F.2d 1186, 1191 fn. 5 (5th Cir.1984).

The trial court having been entirely correct in assessing the pultrusion process as a trade secret based upon its development by Chance and its tremendous share of the market, it was not error to restrict Schmidt's engaging in pultrusion on Hastings products or in engaging in pultrusion on products already produced by Chance.

The limitation of Schmidt's engaging in the pultrusion process with Hastings, a direct competitor of Chance which does not have the process, for 5 years is not overly restrictive nor does it go beyond the common law protection of trade secrets afforded to Chance.

■ In the trial court Schmidt claimed he was not bound by the agreement since he was not emancipated when he signed the agreement. The trial court ruled adversely to him on this point. On appeal in the argument portion of the brief Schmidt alludes to his signing "while under minority." As thus presented, this issue will not qualify for appellate consideration. *Del Monte Corporation v. Stark & Son Wholesale, Inc.*, 474 S.W.2d 854, 857 (Mo. App.1971).

In view of the facts here, the court's limitation on Schmidt's divulging his knowledge of pultrusion to Hastings for 5 years is no greater than is fairly required to protect Chance. *National Starch and Chemical Corp. v. Newman*, 577 S.W.2d 99, 104–05 (Mo.App.1978).

■ Schmidt next argues the injunction was improper as there was no showing he had disclosed or threatened to disclose any trade secrets, and in any event Chance would have an adequate remedy at law for damages. The eastern district in *Smith v. Western Electric Company*, 643 S.W.2d 10 (Mo.App.1982), held injunctive relief is not available unless irreparable harm is likely to result and there is no adequate remedy at law. *Id.* at 13. That opinion further advised though, a plaintiff should not have

to await harm's fruition before being entitled to seek an inadequate legal remedy of damages. *Id.*

In *Osage Glass, Inc. v. Donovan,* 693 S.W.2d 71 (Mo. banc 1985), the employee had signed a covenant not to compete. The supreme court, in upholding injunctive relief for the employer held the purpose of the restriction is to keep the employee, "out of a situation" where he could use the information to the former employer's disadvantage. *Id.* at 75. The court also on page 75 went on to say, "[N]or is it necessary for the employer to show that actual damage has occurred, in order to obtain an injunction. The actual damage might be very hard to determine, and this is one reason for granting equitable relief. The significant circumstance is potential for damage."

In *FMC Corporation v. Varco International, Inc.,* 677 F.2d 500 (5th Cir.1982), a former engineer of FMC who had participated in the development of a swivel joint used in oil well piping went to work for a direct competitor which sought to develop that item. The court upheld an injunction for the former employer finding a valid covenant not to disclose information that qualified as a trade secret under § 759 of the Restatement. The court then held:

> Given the facts of this case—that FMC has trade secrets, that Witt has knowledge of at least some of those secrets, and that Witt has been placed in a comparable position with a direct competitor without restriction against using or disclosing FMC's trade secrets—the fear of irreparable injury is realistic.

677 F.2d at 505.

Similarly in *Union Carbide Corporation v. UGI Corporation, supra,* the appellate court upheld injunctive relief on the basis of the former employee's knowledge of a building system in the hands of a competitor the court said threatened disclosure of trade secrets under such circumstances, and the "irreparable harm in the absence of injunctive relief ...," was sufficient to order a restraint. *Id.* at 1192.

As is true in the case at bar, the plaintiff in *Williams v. Compressor Engineering Corporation,* 704 S.W.2d 469 (Tex.App. 1986), could not qualify the extent of the injury if the former employee disclosed trade secrets. The Texas court said the proof of trade secrets to be used against a former employer will usually support injunctive relief as a matter of law. *Id.* at 471–72.

Schmidt's points are not well taken. He was in a position to injure Chance and the injury that could result from disclosure of the pultrusion trade secret is irreparable. *Sigma Chemical Company v. Harris,* 586 F.Supp. 704 (E.D.Mo.1984).

### III.

Next Schmidt cites error in entry of the injunction because, a) it was too broad and improperly referred to other documents, and b) the injunction went beyond the written agreement.

■ The court enjoined Schmidt from engaging in pultrusion of rods and poles and certain products made by Chance and Hastings. Schmidt says this is too broad a restriction and would keep him from "using his skill and knowledge gained in the pultrusion field." The problem with this argument is that all Schmidt's knowledge was gained during his employment with Chance, and the process as developed by Chance is determined to meet the criteria for being a trade secret.

In a repeat of his argument on whether pultrusion was a trade secret of Chance, Schmidt states, "pultrusion as a process has been around since the early 1950's and there are various other companies which peltrude FRP rods and poles." This assertion flies in the face of the overwhelming evidence on which the trial judge based findings to the contrary. That being the case the limitation placed on Schmidt for a period of 5 years, which neither party objects to, is valid. This provision comports with language in *National Rejectors, supra,* to the effect where injunctive relief has been granted based on misuse of actual trade secrets, courts have limited it to the

time which would have been required to reproduce a "copyable product." 409 S.W.2d at 43; *See also Carboline, supra,* 454 S.W.2d at 552–53. Schmidt is still able to work in the pre-preg method utilized by Hastings.

Rule 92.02(d) provides as follows:

Form and Scope of Injunction or Temporary Restraining Order. Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the petition or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

Without further explanation as to how it is prejudicial, Schmidt states the trial court's order makes reference to other documents, namely the catalogue exhibits of the products, in addition to FRP rods and poles, on which Schmidt was enjoined from working in pultrusion. The portion of the judgment. to which Schmidt refers is as follows: "Defendant is enjoined from engaging in pultrusion of FRP rods and poles especially manufactured for products contained in Plaintiff's Exhibit 34 (Hastings Catalogue) or for any tools manufactured by Plaintiff as specified in Plaintiff's Exhibits 24–29 (Catalogues 7A,B.C.D.E & 7G) ..."

▉ The question presented is whether a Missouri injunction may be set aside solely because it referred to an exhibit offered in evidence. Our Rule 92.02 tracks Rule 65(d) Fed.R.Civ.P. Federal Rule 65(d) is designed to prevent uncertainty on the part of those to whom the injunction is directed. *Helzberg's Diamond Shops, Inc. v. Valley West Des Moines Shopping Center, Inc.,* 564 F.2d 816, 820 (8th Cir.1977). Those enjoined should by the order receive explicit notice of what conduct is outlined and subject to a contempt citation. *Id.*

Federal cases point to a conclusion unfavorable to Schmidt on this issue. *Henry Hope, supra,* 674 F.2d at 1343, held the trial court did not err by attaching a confidential appendix to the injunction which contained the specific trade secrets not divulged in the injunction proper. The opinion stated an injunction should not ordinarily incorporate by reference another document, but this is not a technical requirement but is designed to ensure adequate notice to the defendant of the acts prohibited. In *Henry Hope* as in the present case the injunction specifically outlined the trade secrets and adequately set out the specific acts involving those secrets that were to be prohibited. Schmidt was well acquainted with the exhibits and products, and the fact the injunction did not have spread on it the mass of technical data in the exhibits does not make the order overbroad or vague. The trial court's resorting to this "eminently sensible expedient," was not error. *Henry Hope,* at 1343.

The defendant's contention of vagueness was rejected in *Perfect Fit Industries, Inc. v. Acme Quilting Co., Inc.,* 646 F.2d 800, 809 (2nd Cir.1981). Copies of pertinent exhibits were not attached to the order, but the appeals court held Rule 65(d) was satisfied where it was shown the defendant had a grasp of the documents. *See also DeKar Industries, Inc. v. Bissett-Berman Corporation,* 434 F.2d 1304, 1306 (9th Cir.1970); *Chemical Fireproofing Corporation v. Bronska,* 542 S.W.2d 74, 79 (Mo.App.1976).

The judgment here is amply specific and amply states the acts to be restrained. *Gastineau v. Summit Realty Co.,* 652 S.W.2d 711, 715 (Mo.App.1983).

### IV.

▉ Schmidt's last point is from the denial of attorney fees at the temporary restraining order portion of the case. His former counsel had agreed to the order which allowed him to begin work for Hastings but not allowing him to work in pultrusion. After the hearing on the preliminary injunction the court restrained him from only pultrusion on FRP rods and

poles and the enumerated other products of Chance and Hastings. Based on this change, and relying on § 526.200 which allows damages when an injunction is dissolved, "in whole or in part," Schmidt asked for attorney fees as damages under the auspices of *Collins & Herman, Inc.-Welsbach & Associates Division v. St. Louis County*, 684 S.W.2d 324 (Mo. banc 1985). However, the slight change in restriction from the first to the second order does not amount to Schmidt having had to employ counsel, "in ridding himself of an unjust restriction." *Collins & Herman, supra*, at 326. The point is denied.

The judgment is affirmed.

All concur.