SHOWE–TIME VIDEO RENTALS,
INC., a Missouri corporation,
Appellant,

v.

James H. DOUGLAS and Norma J.
Douglas, Respondents.

No. 15011.

Missouri Court of Appeals,
Southern District,
Division One.

April 6, 1987.

Daniel T. Moore, Poplar Bluff, for appellant.

No appearance for respondents.

CROW, Chief Judge.

This appeal presents the question whether equity will enforce a covenant not to compete, in an agreement that *either* party can terminate at will, where the covenant restricts only *one* party, and the *other* party terminates the agreement, then seeks to enforce the covenant.

Appellant ("Showe-Time") is engaged in the business of renting movie videocassettes to the general public. Showe-Time's videocassettes are available at various outlets, referred to at trial as "branch facilities" and "pit stops." Individuals can obtain "credit cards" from Showe-Time, and use them in renting the videocassettes at the outlets.

On July 30, 1985, respondents ("the Douglases"), proprietors of a retail store known as Lake Road Grocery, entered into a written agreement with Showe-Time. The agreement provided, among other things, that Showe-Time would place a minimum of 30 and a maximum of 250 movie videocassettes at Lake Road Grocery, for rental to the public. The Douglases were to collect the rental fees, which were to be apportioned 30 per cent to them, and 70 per cent to Showe-Time. The Douglases agreed to make available to Showe-Time all rental records concerning the videocassettes, and to remit the amounts due Showe-Time on the second and fourth Tuesdays each month.

The Douglases granted Showe-Time the authority to advertise Lake Road Grocery as a location where the public could rent Showe-Time's movies. The title and nature of the movies to be supplied by Showe-Time to Lake Road Grocery were left to Showe-Time's discretion.

The provisions of the agreement crucial to this appeal are paragraphs 11 and 12:

"11. This agreement shall continue in full force and effect until such time as either party shall notify the other party in writing, giving TWO (2) days' notice of their intention to terminate this agreement. Upon the termination of this agreement by either party as set out above, [the Douglases] shall within ONE (1) day of said termination return all outstanding tapes and records to SHOWE–TIME.

12. It is hereby agreed between the parties that if this agreement is terminated for any reason with or without cause,

that [the Douglases] shall be prohibited from engaging in, assisting in, organizing, managing or having any interest whatsoever in, any movie tape rental, sales or service or any vcr or vcp sales, service or rental for a period of TWO (2) years within the county limits of Butler County, Missouri."

After the agreement was signed, Showe-Time, at its expense, ran newspaper advertisements, and also mailed a "flier" each month to approximately 5,000 members of its "video club." Those announcements listed Lake Road Grocery as one of the sites where Showe-Time's movies could be rented.

The agreement remained in force about 13 months, then Steve Wisdom, president of Showe-Time, came to the conclusion that the Douglases "weren't turning in enough money." Consequently, Wisdom sent the Douglases written notice terminating the agreement.

After Wisdom had removed Showe-Time's videocassettes from Lake Road Grocery, the Douglases purchased 50 videocassette movies from a supplier in St. Louis, and began renting them to customers at Lake Road Grocery.

Soon thereafter, the Douglases received a letter from Showe-Time, informing them that they were in violation of the covenant not to compete. Undeterred, the Douglases continued to rent their movies.

On October 15, 1986, Showe-Time commenced this action, seeking, among other relief, an injunction barring the Douglases "from engaging or being involved in the business of movie tape rentals for a period of two years, within the confines of Butler County, Missouri." At Showe-Time's behest, the trial court immediately issued a temporary restraining order.

The cause was tried a week later, and on October 24, 1986, the trial court entered a decree dissolving the temporary restraining order, and denying Showe-Time's prayer for a permanent injunction. Showe-Time appeals from that decree.[1]

Nothing in the record before us indicates that either party specified any fact issues for the trial court to resolve, and the legal file, Rule 81.12(a),[2] contains no findings of fact or conclusions of law. In such circumstances, all fact issues shall be considered as having been found in accordance with the result reached, Rule 73.01(a)(2), and the decree will be upheld under any reasonable theory supported by the evidence. *O'Bar v. Nickels*, 698 S.W.2d 950, 955[1] (Mo.App.1985); *Elliott v. West*, 665 S.W.2d 683, 689–90[4] (Mo.App.1984).

Showe-Time relies on one assignment of error, which states:

"The trial court erred in refusing to grant [Showe-Time] injunctive relief and thus failing to enforce the contractual agreement of a covenant not to compete between [Showe-Time] and [the Douglases] because as a matter of law, the covenant not to compete was reasonable both by the limitations on time and area contained in the agreement."

The above point and the argument that follows it assume that if the provisions in a covenant not to compete are reasonable as to length of time and size of territory, and if the evidence establishes that the covenant is ancillary to a legitimate protectable interest of the party in whose favor the covenant runs, the covenant must be enforced. Such assumption ignores the more fundamental question posed at the outset of this opinion.

As the trial court made no findings of fact or conclusions of law, there was obviously no holding by the trial court that the Douglases had breached any provision of the agreement. While Wisdom was dissatisfied with the amount of money Showe-Time was receiving from the Douglases,

---

**1.** Showe-Time's petition also prayed the trial court for money damages, and the Douglases counterclaimed for money damages allegedly caused by the temporary restraining order. The trial court denied all requests for money damages. Showe-Time assigns no error in the denial of its claim for damages, and the Douglases did not appeal the denial of their claim for damages. We therefore consider only the enforceability of the covenant not to compete.

**2.** Rule references are to Missouri Rules of Civil Procedure (18th ed. 1987).

there was no evidence that the Douglases withheld any money due Showe-Time. Wisdom's testimony on that subject was:

"Q. ... When the—When the contract was terminated, it was—it was because they weren't making enough money or they weren't—Let me strike that. They weren't turning in enough money; is that the reason it was terminated?

A. Yes.

Q. You don't know whether the rentals were made or not, but the income figures they produced to you weren't satisfactory?

A. Yes."

Norma Douglas' testimony on the subject was:

"Q. Did you ever rent any movies from Show Time [sic] Video and not pay the percentage to Show Time [sic] Video?

A. No.

Q. You never hid any tickets or—

A. No.

Q. —didn't make out a ticket?

A. You have—Well, all—

Q. Just answer my question, ma'am.

A. No. No.

Q. You never did that?

A. No."

From what has been set forth, a perceptive observer will begin to discern the troublesome aspect of this case. Consider the following hypotheticals.

Suppose, soon after Showe-Time had entered into the agreement with the Douglases, a new, attractive supermarket had opened for business a short distance from Lake Road Grocery. The supermarket immediately attracts a greater number of customers than Lake Road Grocery. Mindful of this, and foreseeing that more videocassettes can be rented at the supermarket than at Lake Road Grocery, Showe-Time terminates the agreement under paragraph 11, *supra*, moves its videocassettes from Lake Road Grocery to the supermarket, then insists that the Douglases—who

through no fault of their own have been stripped of Showe-Time's videocassettes—refrain from engaging in the videocassette rental business for two years. The harshness of enforcing the noncompete covenant against the Douglases in such circumstances is obvious.

Conversely, suppose that the Douglases, after a year under the agreement with Showe-Time (during which the latter's advertisements generated videocassette rental business at Lake Road Grocery), had received an offer from a competing videocassette rental company to supply more movies than Showe-Time and to allow the Douglases to retain 40 per cent of the rental fees. The Douglases thereupon terminate the agreement with Showe-Time per paragraph 11, and begin renting videocassettes supplied by the new company. Denying Showe-Time the benefit of the noncompete covenant for the two-year period under this scenario would be just as unfair to Showe-Time as enforcing the covenant against the Douglases would have been under the first hypothetical.

The facts of the instant case are not, of course, as extreme as either of the two hypotheticals. For example, we do not know what Showe-Time did with the videocassettes it removed from Lake Road Grocery, nor do we know whether Showe-Time's low revenue from Lake Road Grocery was because (a) the store had a small clientele, (b) Showe-Time placed movies there which did not appeal to the customers, or (c) the Douglases did not remit to Showe-Time all the money due it. We cannot, however, assume "(c)," as there is no evidence to support it, and the trial court made no such finding.

■ Showe-Time does not cite,[3] and our independent research has not found, a case identical to this one. There are, however, cases similar enough to be helpful.

3. The Douglases filed no brief. A "notice" filed in this Court by the attorney who represented them at trial states that they have sold "the building, grounds and inventory of Lake Road Grocery." While it might appear that this development has rendered the case moot, the two-year ban on competition has not yet expired, thus the Douglases could conceivably resume the videocassette rental business. We are therefore obliged to decide the appeal.

In *Economy Grocery Stores Corporation v. McMenamy*, 290 Mass. 549, 195 N.E. 747 (1935), the plaintiff corporation hired the defendant to manage the meat department in one of its stores. The employment contract provided that if the defendant's employment were terminated, either voluntarily or involuntarily, he would not, for a period of one year, engage in or be employed by any food supply business within a two-mile radius of any store owned by the plaintiff where he had worked. Nothing in the contract compelled the plaintiff to employ the defendant for any definite period. The plaintiff discharged the defendant without cause during the third year of his employment. The defendant thereafter obtained employment in a meat market owned by his brother, a short distance from the store where the defendant had formerly worked. The plaintiff sought a decree enjoining the defendant from violating the non-compete clause.

The opinion stated:

"If the defendant had left the employ of the plaintiff voluntarily, or had been discharged for cause, there would be little question that the plaintiff would be entitled to relief. The contract was not void for lack of consideration. When accepted and acted on by the plaintiff, it implied according to its reasonable construction a promise on the part of the plaintiff to employ the defendant. It was not wanting in mutuality.... The contract might have been terminated at the will of either party. An employer may act so arbitrarily and unreasonably in exercising his right of termination that a court of equity will refuse aid in enforcing for his benefit other parts of the contract.... A suit in equity like the present, to enforce a negative covenant made by the defendant, is in reality a petition for specific performance.... Specific performance is not a matter of strict and absolute right. A petition of that nature is addressed to the sound discretion of the court. It will not be granted if the conduct of the plaintiff is savored with injustice touching the transaction, even though there is no sufficient ground for the rescission of the contract.... A court of equity does not lend its aid to parties who themselves resort to unjust and unfair conduct." 195 N.E. at 748.

Observing that the trial judge had found that the plaintiff's meat department was built up entirely by the personal efforts of the defendant in the face of competition, the appellate court upheld the trial court's denial of injunctive relief.

*Security Services, Inc. v. Priest*, 507 S.W.2d 592 (Tex.Civ.App.1974), was factually similar to *Economy Grocery*. In *Security Services*, the plaintiff corporation employed the defendant as sales manager. The employment contract provided that the defendant's employment could be terminated by either party upon 30 days' written notice, or by the plaintiff, with or without cause, upon payment of two weeks' severance pay to the defendant. The contract prohibited the defendant from competing with the plaintiff in certain specified counties for one year after termination of the defendant's employment. The plaintiff discharged the defendant without notice some four months after he was hired, paying him two weeks' severance pay. The defendant thereupon began competing with the plaintiff, and the plaintiff sought injunctive relief. The trial judge (like the trial court in the instant case) denied relief, making no findings of fact. The appellate court, consequently, presumed that the trial judge had resolved all fact disputes against the plaintiff.

The opinion stated:

"If the contract is terminable at the will of the employer, the covenant [not to compete] does not for that reason alone lack consideration.... There is authority, however, to the effect that even though the employment may be terminated at will, equity may deny enforcement of the covenant if the employer acts arbitrarily and unreasonably in discharging the employee." *Id.* at 595.

The trial judge's denial of relief was affirmed.

We are mindful, of course, that the covenants not to compete in *Economy Grocery* and *Security Services* appeared in contracts of employment between an employer and an employee, whereas the instant case involves an agreement between a corporate supplier of rental items and a partnership outlet for such items. There are, nonetheless, significant similarities.

In *Economy Grocery* and *Security Services,* the party seeking to enforce the covenant was attempting to avoid the loss of its customers to its former employee. In the instant case, Showe-Time had expended effort and money building up its credit card operation and videotape rental club. Showe-Time argued that after the termination of its agreement with the Douglases, they would be renting their own videocassette movies to people who had formerly rented Showe-Time's movies.

A second similarity between the two cited cases and the instant case is that in all three, the contract was terminable by either party, without cause. A third similarity is that in all three cases, the covenant not to compete ran in favor of only one party, and it was that party who terminated the contract, then sought to enforce the covenant. A fourth similarity is that in all three cases, there was no showing that the party against whom the covenant ran was at fault or was guilty of any violation of the contract.

We find *Economy Grocery* and *Security Services* well reasoned, and believe their rationale should apply in the instant case, unless Missouri law requires otherwise.

Showe-Time cites three Missouri cases, one of which is *Computer Sales International, Inc. v. Collins,* 723 S.W.2d 450 (Mo. App.1986), which involved a two-year non-compete covenant in an employment contract. The contract was terminable by either party, without cause. The employee, a computer equipment marketing representative, resigned after more than three years' employment, then immediately went to work for a competitor of his former employer. The former employer sought injunctive relief to enforce the covenant. The trial court denied relief, but the judg-

ment was reversed and the cause was remanded with directions to address the issue whether the lack of a geographical restriction in the covenant rendered it unreasonable. Pertinent to the instant case, the party seeking enforcement of the covenant in *Computer Sales* was *not* the party who terminated the employment.

*Reed, Roberts Associates, Inc. v. Bailenson,* 537 S.W.2d 238 (Mo.App.1976), also cited by Showe-Time, involved a three-year non-compete covenant in an employment contract, terminable by either party on one week's notice, without cause. After more than six years' employment, the employee resigned, then promptly went to work for a competitor of his former employer. A decree enforcing the non-compete covenant was entered by the trial court, and affirmed on appeal. Here again, the party seeking enforcement of the covenant was *not* the party who terminated the employment.

Other Missouri cases upholding injunctive enforcement of non-compete covenants in employment contracts terminable at will by either party, where the *employee* voluntarily terminates his employment, then begins competing with his former employer, include *Deck and Decker Personnel Consultants, Ltd. v. Pigg,* 555 S.W.2d 705 (Mo. App.1977); *Chemical Fireproofing Corporation v. Bronska,* 542 S.W.2d 74 (Mo.App. 1976); *Mills v. Murray,* 472 S.W.2d 6 (Mo. App.1971); *Renwood Food Products, Inc. v. Schaefer,* 240 Mo.App. 939, 223 S.W.2d 144 (1949); *Haysler v. Butterfield,* 240 Mo. App. 733, 218 S.W.2d 129 (1949); *City Ice & Fuel Co. v. Snell,* 57 S.W.2d 440 (Mo. App.1933); *City Ice & Fuel Co. v. McKee,* 57 S.W.2d 443 (Mo.App.1933).

Injunctive enforcement of a non-compete covenant in an employment contract terminable at will by either party has also been upheld in Missouri where the employer discharges the employee *for cause,* and the employee then begins competing with his former employer. *R.E. Harrington, Incorporated v. Frick,* 428 S.W.2d 945 (Mo.App.1968); *Farmers Underwriters Association v. Reid,* 425 S.W.2d 247 (Mo.App. 1967). Another case that appears to fall in

this category is *House of Tools and Engineering, Inc. v. Price*, 504 S.W.2d 157 (Mo. App.1973). In that case, the opinion states that the employee was "discharged" by the employer, thus it is inferable, though not certain, that the employer had cause for terminating the employment.

We find but one Missouri case, however, enforcing a non-compete covenant in an employment contract terminable at will by either party, where it is clear that the *employer* terminated the employment *without cause,* and the employee thereafter began competing with his former employer: *American Pamcor, Inc. v. Klote,* 438 S.W.2d 287 (Mo.App.1969). There, an employment contract contained a covenant by the employee that for a period of one year from the termination of his employment, he would not directly or indirectly, as to products competitive to those sold by his employer, solicit or accept business from any of the employer's customers that he had contacted in the territory he had serviced for the employer. After some ten years' employment, the employer discharged the employee because of "a reduction in force." The employee commenced a business handling the same type products as his former employer, and employed two salesmen who had formerly worked for the employer. They made sales to some customers whom the former employee had contacted while working for the employer. The latter sought injunctive enforcement of the non-compete clause. The trial court denied relief.

On appeal, the judgment was reversed. Injunctive relief, however, was no longer feasible, as the one-year non-compete period had expired. The appellate court remanded the cause with directions that the trial court ascertain and award the employer money damages. It must be noted that the covenant in *American Pamcor* did not bar the former employee from engaging in the same kind of business as his former employer, it merely forbade him from soliciting or accepting business from any of his former employer's customers whom he had contacted while in the employer's service. The covenant in the instant case is far broader, as it bars the Douglases from renting videocassette movies to anyone.

In *Prentice v. Rowe*, 324 S.W.2d 457 (Mo.App.1959), a complex case involving a "curious concatenation of contracts, covenants, conflicts and confusion," a non-compete covenant in an employment contract was enforced against an employee who resigned, then began competing against his former employer. There was an issue whether the resignation was voluntary or involuntary, and the answer to that question cannot be ascertained from the opinion. It is noteworthy, however, that the court stated: "The remedy of injunction, frequently characterized as the strong arm of equity, is a summary, transcendent and extraordinary remedy, may not be invoked as a matter of course, and should be exercised sparingly and only in clear cases." *Id.* at 463[8].

*Willman v. Beheler*, 499 S.W.2d 770 (Mo. 1973), involved a non-compete covenant in a *partnership* contract between an older physician and a younger physician, terminable by either party at will. The covenant provided that if the younger physician left the partnership voluntarily or involuntarily, he would not practice medicine in a particular city for five years from the date of his departure. The older physician became dissatisfied with certain traits of the younger physician, so the former dissolved the partnership, then sought an injunction barring the latter from practicing in the specified city. The trial court denied relief. By the time the case was decided by the Supreme Court, almost five years had elapsed since the split-up. The Supreme Court determined that while the non-compete clause was valid, it would be unjust to the younger physician to enjoin him for a five-year period commencing on the date of the Supreme Court's decision. Consequently, the Supreme Court remanded the case to the trial court with directions to determine the financial loss, if any, sustained by the older physician during the non-compete period.

Injunctive enforcement of a non-compete covenant in a medical partnership agreement was granted in an earlier case, *Thompson v. Allain*, 377 S.W.2d 465 (Mo.

App.1964). In that case, however, the defendant *voluntarily* left the partnership, then began practicing in the prohibited area.

The third, and final, case cited by Showe-Time is *Herrington v. Hall*, 624 S.W.2d 148 (Mo.App.1981). While the facts and the agreements in that case are complex, the significant aspect is that Hall contracted to operate one component of an established business owned by Tharp, the contract evidently being terminable by either party at will. The contract contained a non-compete covenant, barring Hall from operating a similar business within a specified radius for three years after termination of the agreement. Tharp ultimately transferred his rights under the agreement to Herrington and others, and they then terminated the arrangement with Hall. Injunctive enforcement of the non-compete covenant was denied at trial, but awarded on appeal. *Herrington,* therefore, appears to support Showe-Time; however, it is important to remember that in *Herrington,* the object of the action was to protect a single, established business that Hall had formerly operated, while in the instant case the evidence showed that stores throughout Butler County were already renting movie videocassettes to the public, and that Showe-Time had outlets in only six such stores.

■ The pattern that emerges from the Missouri cases is that if a non-compete covenant is reasonable as to length of time and size of territory, and if the evidence establishes that the covenant is ancillary to a legitimate protectable interest of the party in whose favor the covenant runs, the covenant will be enforced by injunction where the party against whom it runs is the party that terminates the arrangement and begins competing against the other party. Injunctive enforcement will also be granted where the party in whose favor the covenant runs terminates the arrangement for good cause.

■ Where, however, the party in whose favor the covenant runs terminates the arrangement *without* good cause, enforcement by injunction is not so clearly established. A recent Iowa case illustrates why

equity is cautious about enforcing a non-compete covenant in such circumstances.

*Ma & Pa, Inc. v. Kelly,* 342 N.W.2d 500 (Iowa 1984), involved an employment contract containing a covenant by the employee that if his employment were terminated for any cause whatever, he would not engage in any manner in any line of business in which the employer might then be engaged, within a specified radius, for a period of three years. After some three years' employment, changing market conditions made it unprofitable for the employer to continue the employment of the employee, so the employer dismissed him, reminding him of the covenant not to compete. The employee took a job with a competing company, underbid the former employer in certain instances, and took business from the former employer. The former employer commenced an action for injunctive enforcement of the non-compete covenant. The trial court granted relief, and the former employee appealed.

The appellate court recognized the general rule that a non-compete covenant in an employment contract would be enforced if it is reasonably necessary for the protection of the employer's business and is not unreasonably restrictive of the employee's rights nor prejudicial to the public interest. The court observed, however, that a factor in *Ma & Pa* was the discharge of the employee by the employer, as distinguished from a resignation originating with the employee. The court said:

"Under some circumstances termination of the employment by [the employer] would not invalidate the covenant not to compete.... On the other hand discharge by the employer is a factor opposing the grant of an injunction, to be placed in the scales in reaching the decision as to whether the employee should be enjoined.... Other factors in the case, although not decisive in themselves, militate against the grant of an injunction.... The employment was at will, enabling [the employer] to terminate it at any time and assert the clause prohibiting competition.... The business [the employee] obtained for his new employer

does not appear to have derived so much from his personal influence as [the former employer's] uncompetitive pricing. Finally, the ... users of ... [the former employer's] products in the territory must be ascertainable by reasonable diligence without a customer list." *Id.* at 502–03.

The opinion held that while the former employer did not breach the contract by terminating the employment, the case was nonetheless in equity, and upon weighing the equities on both sides, the trial court should not have granted the injunction. *Id.* at 503.

Such, it seems to us, are the equities here. As noted earlier, there was no evidence that the Douglases breached any provision of the agreement, and, as the trial court made no findings of fact, all fact issues are deemed found in accordance with the result reached. Furthermore, in reviewing this court-tried case, we must sustain the decree of the trial court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32[1] (Mo. banc 1976). We should exercise the power to set aside a decree on the ground that it is against the weight of the evidence with caution, and with a firm belief that the decree is wrong. *Id.* at 32[2].

■ Mindful of those admonitions, we note that Showe-Time admittedly terminated the agreement, thus the Douglases lost the opportunity to earn income from the rental of Showe-Time's videocassettes through no fault of their own. It is also evident that the market for movie videocassette rentals in Butler County was not created by the efforts of Showe-Time alone. Wisdom himself admitted that in Butler County, one could find a movie videocassette for rent in "about any Mom and Pop store you go to." Furthermore, there was no proof of any trade secrets or unique aspects about Showe-Time's business. In that regard, the Douglases' knowledge about rental of movie videocassettes did not come exclusively from Showe-Time.

Before entering into the agreement with Showe-Time, the Douglases had had a similar arrangement with another supplier of rental movies.

Finally, it can be reasonably inferred that if Showe-Time suffered any financial loss by reason of removing its videocassettes from Lake Road Grocery, it was minimal. If Showe-Time's arrangement with the Douglases had been profitable, it is unlikely that Showe-Time would have terminated it.

Given all the circumstances heretofore discussed, we cannot say that the trial court's denial of injunctive relief was unsupported by substantial·evidence, contrary to the weight of the evidence, or erroneous as a matter of law. We therefore hold that Showe-Time has failed to demonstrate reversible error.

■ We recognize, of course, that Showe-Time committed no violation of the agreement by terminating it, as Showe-Time had the right to do so under paragraph 11. That option, however, did not automatically carry with it the right to injunctive enforcement of the non-compete covenant. Whether to grant such relief was within the sound discretion of the trial court, and the record before us reveals no abuse of discretion.

We need not, and do not, speculate what the outcome should have been had the Douglases terminated the agreement, or had Showe-Time terminated the agreement because of misconduct by the Douglases, as no such questions are before us. Emphasizing that our holding is strictly confined to the evidence in the instant record, we deny Showe-Time's assignment of error, and affirm the decree.

GREENE, P.J., and PREWITT, J., concur.