**SUPERIOR GEARBOX COMPANY,**
Plaintiff–Respondent,

v.

**Wallace L. EDWARDS, John Carter,
Robert Bell and SCG Incorporated,**
Defendants–Appellants.

No. 18102.

Missouri Court of Appeals,
Southern District.

Dec. 22, 1993.

Motion for Rehearing or Transfer
Denied Jan. 12, 1994.

Application to Transfer Denied
Feb. 22, 1994.

Joseph B. Phillips, Phillips & Phillips, Stockton, Lloyd L. Messick, Cronan & Messick, Kansas City, for defendants-appellants.

David E. Wilhite, Donnelly, Baldwin & Wilhite, Lebanon, Samuel J. Short, Stockton, for plaintiff-respondent.

MONTGOMERY, Judge.

In July 1989, Plaintiff, Superior Gearbox Company (Superior), brought this action against Defendants Wallace L. Edwards (Edwards), John Carter, Robert Bell, and SCG Inc.,[1] alleging eight contractual and commercial trade violations.[2] After severing Superior's prayer for damages from the equitable issues presented, the trial court granted injunctive relief in favor of Plaintiff. Defendants appeal the propriety of those injunctions.[3]

Defendants raise five points on appeal.[4] They contend that the trial court erred, first, by enjoining Edwards from engaging in the gearbox business; second, by ordering that Edwards' injunction should run for a 10–year period, commencing at the time of judgment; third, by forbidding Defendants for 10 years from using a particular milling process that Superior developed and still employs; fourth, by prohibiting Defendants from using the

---

1. Despite the style of the case, Plaintiff alleged in its petition and Defendants admitted in their answer that the corporate defendant in this action is Split Case Gearbox Co., a Missouri corporation, doing business as SCG Inc.

2. The petition alleges violation of a covenant not to compete, misappropriation of trade secrets and confidential business information, infringement of trademark and trade dress, unfair competition, conspiracy, and violation of the Lanham Act.

3. The trial court properly certified its judgment as final pursuant to Rule 74.01(b). Therefore, we have jurisdiction over Defendants' appeal. *Boatmen's Trust Co. v. Sugden*, 827 S.W.2d 249, 252 (Mo.App.1992).

4. Superior has filed a motion to dismiss Defendants' appeal for failure to timely file the notice of appeal. After careful consideration of the motion, we conclude it must be denied.

mark SCG to advertise or sell gearboxes; and fifth, by enjoining Defendants from using a so-called "double web" design for its gearbox housings—a design Superior has used for several years before Defendants began using it.

## ISSUES

Defendants' complaints raise the following questions, arranged according to Defendants' points relied on.

First, based on the evidence in the record, was the trial court justified in holding that Edwards was terminated for good cause by his employer?

Second, did the trial court's decision to enforce a non-competition agreement against Edwards for 10 years from the date of judgment constitute an abuse of discretion, go against the weight of the evidence, or violate public policy?

Third, was the trial court justified in not believing Defendants' proffered evidence that the metal milling process Superior developed, and which Defendants later used, was well known, easily discoverable, and easily duplicated?

Fourth, is there sufficient evidence in the record to support the trial court's finding that Plaintiff began using the mark SGC (the initials of Superior Gearbox Company) in connection with its products before Defendants began using the similar mark SCG? Assuming that the court's finding was justified on this point, is there sufficient evidence in the record to support the court's finding that Plaintiff's product had become associated with the mark SGC and that Defendants' use of the similar mark SCG would likely cause confusion among customers and others?

Fifth, when the trial court enjoined Defendants from using a double web design for its gearboxes—a design allegedly identical to the one Superior uses—was that decision based on sufficient evidence and a proper application of the law?

## FACTS

In 1975, Detroit Tool & Engineering Company (Detroit) purchased the assets of Feem, Inc., a bankrupt Kansas corporation. The next year, Detroit used these assets to form a new entity, Superior Gearbox Company, a Missouri corporation that operates in Stockton, Missouri. At the time it organized Superior, Detroit offered a 10 percent ownership interest in the new company both to Stewart Thomson and to Defendant Wallace Edwards, each of whom had formerly been associated with Feem. Both men accepted the offer and began working for the new company. Edwards became Superior's president and chief executive officer.

Soon after Superior was organized, Thomson, Edwards, and Detroit's Chief Executive Officer, Richard Carr, began working with Detroit engineering personnel to develop an efficient, effective method of manufacturing aluminum split-case gearboxes. These gearboxes were to be, and now are, Superior's primary product.[5] In time, Detroit personnel developed a so-called plunge milling race machine and corresponding plunge milling procedure for manufacturing these split-case gearboxes.[6] Superior has used both the race machine and the plunge milling procedure ever since.

---

**5.** Almost exclusively, Superior manufactures what are called right-angle, split-case gearboxes. These are used as component parts of industrial equipment and agricultural implements such as ditch-digging machines, mower decks, or tilling attachments. "Right-angle" refers to the fact that drive shafts enter these gearboxes at right angles. "Split-case" indicates that the aluminum case surrounding the internal moving parts of a gearbox are constructed of two pieces, one side being more or less the mirror image of the other.

**6.** Pursuant to a trial court order, detailed information about the plunge milling race machine and process may not be revealed. The following

description is therefore quite general; it reveals nothing that Superior's competitors could use to the company's detriment. In essence, the plunge milling race machine is a type of lathe used to remove excess metal from inside the cast aluminum housings of Superior gearboxes. The machine has allowed Superior to produce housings that are more uniform than those produced by other companies and has enabled Superior to reduce or eliminate problems with lubricant leaking from the gearboxes. In the past, gearboxes were especially prone to leak around bearing "races" (grooves in the aluminum housings into which bearings are fitted).

In 1986, Richard Carr left his position as Detroit's CEO, purchased Detroit's 80 percent interest in Superior, and became CEO at Superior. Later that year, he approached Edwards and Thomson about signing a Stock Purchase Agreement. Carr intended this agreement to be a means of enticing Edwards and Thomson to stay with Superior, because Carr had no desire to manage the company's day-to-day affairs. After six months or more of negotiation among the parties, during which time Thomson and Edwards insisted upon and received a number of changes in the original proposed document, the three signed the agreement.

Included in this agreement, among other things, was a multi-year non-competition covenant. As part of that covenant, Edwards and Thomson acknowledged that the milling machinery and procedures developed and used by Superior were unique and were a valuable part of the company's assets. Each man also agreed that, if he should ever cease to be an officer or employee at Superior, for 10 years thereafter he would not engage in a business anywhere in the United States that manufactures or sells gearboxes or uses plunge milling procedures or technologies. As part of the same agreement, each man was to (and did) receive a five percent annual bonus as long as he remained with Superior. In addition, Edwards obtained a commitment from Carr that, should Edwards ever default on a certain personal loan, Carr would purchase Edwards' 10 percent stock interest in the company.

In the years after Edwards and Carr signed this agreement, the relationship between the two men was at times strained. In particular, they came to disagree about Edwards' duties and responsibilities within the company. In July 1988, after having previously instructed Edwards to concentrate full time on sales, Carr followed up with instructions that either Edwards or his sales associate needed to be "on the road" at all times, seeking new customers and new orders. When Edwards failed to meet Carr's expectations of increased sales activity, Carr demanded and received Edwards' resignation on October 10, 1988.

Following his departure from Superior, Edwards, along with Defendants John Carter and Robert Bell (both of whom were long-time Superior employees), formed Split Case Gearbox Co. (Split Case), a Missouri corporation also located in Stockton, Missouri, and doing business as SCG Inc. Like Superior, Split Case manufactured aluminum split-case gearboxes. Also like Superior, it used a plunge milling race machine and corresponding plunge milling process as part of its operations.

The plunge milling race machine Split Case used was substantially the same as the one developed at Superior. The milling procedure it used was also substantially the same as Superior's. In addition, in 1989 Split Case began using the mark SCG in connection with the company and began producing gearboxes distinguished by a so-called double web design, the same design Superior uses for its gearboxes. After its founding, Split Case marketed its products to many of the same customers Edwards served during his years as sales supervisor at Superior.

## I.

Defendants' first point on appeal is that Richard Carr, acting for Superior, terminated Edwards' employment without good cause; and because of this, the trial court should not have enforced the non-compete provisions of Edwards' Stock Purchase Agreement. We cannot agree. Competent evidence appears in the record to support the court's finding that Carr dismissed Edwards for good cause.

■ The scope of our review of this judge-tried case is established by Rule 73.01(c), as construed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). The judgment of the trial court will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Id.* at 32.

■ Determining what constitutes a discharge for good or just cause presents a problem in the instant case because Edwards was an employee-at-will, and the law in Missouri is well settled that an at-will employee

may be discharged for any reason at all, or even for no reason.[7] *Johnson v. McDonnell Douglas Corp.*, 745 S.W.2d 661, 663 (Mo. banc 1988); *Eggleston v. Phillips*, 838 S.W.2d 80, 82 (Mo.App.1992). Nevertheless, in light of *Showe–Time Video Rentals, Inc. v. Douglas*, 727 S.W.2d 426 (Mo.App.1987),[8] and other cases Defendants rely on, consideration of the question is necessary.

Unfortunately, "[t]he term 'just cause' has not been defined generally by Missouri cases." *Roach v. Consolidated Forwarding Co.*, 665 S.W.2d 675, 680 (Mo.App.1984). Neither have terms like "good cause," "sufficient cause" and other similar terms been generally defined. Nonetheless, in cases like *Roach*, in which individuals employed under collective bargaining agreements or other fixed-term employment contracts have challenged their dismissals, courts have attempted to define these terms. In *Roach*, for example, the Court held the following definition of "just cause" in a jury instruction to be proper:

> [It is] a real cause or basis for dismissal as distinguished from an arbitrary whim or caprice—that is, a cause or ground that a reasonable employer, acting in good faith under the collective bargaining agreement here in question, would regard as good and sufficient reason for terminating the services of an employee.

*Id.* at 679 n. 2. According to the same court, a discharge may also be described as being for just cause (or for "justifiable cause," "proper cause," "obvious cause," or simply for "cause") when an employer fires an employee for lying, stealing, repeated absence or lateness, destruction of company property, brawling and similar infractions. *Id.* at 680, citing *Worthington Corp. and United Electrical, Radio and Machine Workers of America, Local 259*, 24 LA 1, 6–7 (1955).

■ A related rule of law is that an employer has the right to dismiss an employee who is guilty of insubordination. Stated another way, "[i]n every contract of employment it is implied that the employee will obey the lawful and reasonable rules, orders and instructions of the employer, and disobedience of such known rules justify the employee's discharge." *Craig v. Thompson*, 244 S.W.2d 37, 41 (Mo. banc 1951).

■ Employees may also be justifiably discharged for incompetence or negligence. "That incompetency or neglect of duty gives a ground for discharge is not questioned." *Maratta v. Chas. H. Heer Dry Goods Co.*, 190 Mo.App. 420, 177 S.W. 718, 719 (1915) (dressmaking department manager dismissed for unskillful, unsatisfactory, incompetent work).

■ In Point I, Edwards challenges the trial court's judgment by contending that Carr did not discharge him for good cause. By so doing, he essentially challenges the trial court's determination on (1) the credibility of certain witnesses at trial; (2) the weight to be given those witnesses' testimony; and (3) whether this evidence sufficiently established that Carr discharged him for good cause.

In determining the sufficiency of evidence to support a decree in a judge-tried case, this Court "accepts as true the evidence and inferences from it favorable to the decree and disregards contrary evidence." *Zweemer v. Cantrell*, 823 S.W.2d 531, 533 (Mo.App.1992). Likewise, "[c]redibility of the witnesses and the weight to be given their testimony were matters for the trial court, which was free to believe none, part, or all of their testimony. We do not substitute our judgment for that of the trial court on credibility issues." *Id.* at 534.

Based on evidence adduced at trial, the court below found the following:

---

**7.** An exception to this general rule is the so-called public policy exception. *See, e.g., Luethans v. Washington University*, 838 S.W.2d 117 (Mo.App.1992). That exception has no bearing on this case.

**8.** *Showe–Time* holds that, in some circumstances, if a party seeking to enforce a covenant not to compete has, *without cause*, terminated the underlying contractual or employment relationship, a court should not enforce the covenant. Thus, if an employer discharges an employee without cause and subsequently attempts to enforce a non-competition covenant the employee had signed, a court should perhaps decline to enforce the covenant. 727 S.W.2d at 433.

In 1987, not long after Carr became actively involved in the management of Superior, he developed concerns about the company's financial situation. Because of this, he discussed with Edwards the need for Edwards to increase his own sales efforts and to secure the services of additional sales representatives. Edwards resisted this latter suggestion.

Then, in mid–1988, after several more discussions with Edwards about declining sales and the need for increased efforts, Carr ordered Edwards to concentrate on sales full time. Carr also insisted that either Edwards or his assistant must be "on the road" at all times seeking new customers and additional orders. Despite this directive, Edwards did not step up his sales efforts. In fact, the sales activity of Edwards and his assistant may actually have dropped. This lack of effort, the court concluded, amounted to insubordination and was a primary reason for Carr's decision to dismiss Edwards on October 10, 1988.

The other major reason for Carr's decision to dismiss Edwards was Edwards' handling of three failed company projects. As a result of what the court called inattention, poor business judgment, lack of proper analysis, and neglect by Edwards, one of these projects required Superior to produce gearboxes at a cost higher than what the company would receive in payment. A second project would have resulted in the same predicament if Superior had not been able, fortuitously, to avoid the contract. Both projects resulted in the loss of several thousand dollars.

The third project involved a multi-million dollar contract that fell through because the gearbox purchaser ran into economic difficulties. In order to salvage the preparation and production work already done on the project, Edwards contacted a possible alternative buyer. Immediately after, he called a meeting of the entire Superior staff to announce that this alternative company was going to purchase the gearboxes already produced

and that the company wanted Superior to produce even more units in the future than were called for under the original, failed contract.

As Carr soon discovered, no new contract existed. No one at the second company had ever made a commitment to purchase the inventory or to take over the earlier project. As with the first two projects, the court found that Edwards' inattention and neglect in handling this one resulted from his bad business judgment.

Based on the foregoing evidence, we conclude the trial court properly found that Carr discharged Edwards for good cause. That being so, *Showe–Time,* the principal case Edwards relies on, does not aid him. In *Showe–Time,* we said:

> The pattern that emerges from the Missouri cases is that if a non-compete covenant is reasonable as to length of time and size of territory, and if the evidence establishes that the covenant is ancillary to a legitimate protectable interest of the party in whose favor the covenant runs, the covenant will be enforced by injunction where the party against whom it runs is the party that terminates the arrangement and begins competing against the other party. *Injunctive enforcement will also be granted where the party in whose favor the covenant runs terminates the arrangement for good cause.*

727 S.W.2d at 433 (emphasis added).

■ In the argument section under Point I, Defendants advance a weak argument that Defendants Bell and Carter should not have been enjoined from selling to customers of Superior since they were not parties to the non-competition agreement.[9] This allegation of error does not appear in Defendants' Point I. We are "obliged to determine only those questions stated in the points relied on. Issues raised only in the argument portion of the brief are not presented for review."

---

9. The trial court based its injunction of Bell and Carter on the principle that, if an individual knows about a non-compete agreement and assists a party to that agreement in violating it, the individual may be enjoined from benefiting from the breach. *See A.B. Chance Co. v. Schmidt,* 719

S.W.2d 854 (Mo.App.1986); *Mills v. Murray,* 472 S.W.2d 6 (Mo.App.1971); *Clark–Lami, Inc. v. Cord,* 440 S.W.2d 737 (Mo.1969); *Contour Chair Lounge Co. v. Aljean Furniture Mfg. Co.,* 403 S.W.2d 922 (Mo.App.1966).

*Mashburn v. Tri–State Motor Transit Co.,* 841 S.W.2d 249, 252 (Mo.App.1992). Point I has no merit.

## II.

In their second point, Defendants contend that the trial court erred by enjoining Edwards from engaging in the gearbox business for 10 years from the date of judgment because (a) there was no substantial evidence that a 10–year period was reasonable, (b) a 10–year injunction was against the weight of the evidence, and (c) the trial court erroneously applied the law because such an injunction should have run from October 10, 1988, the date on which Edwards was discharged.

■ Beginning with Defendants' third sub-point, we hold that, under the circumstances of this case, the trial court did err when it ordered Edwards' injunction to commence on the date of judgment. In so doing, we do not hold that such an injunction may never begin from the date of judgment. But several reasons militate against the trial court's decision in this case.

Both the Stock Purchase Agreement between Superior and Edwards and Plaintiff's first amended petition indicate each party anticipated that if Edwards left the company, his period of non-competition would be measured from the date he departed. The Stock Purchase Agreement states that Edwards and Stewart Thomson would refrain from competing with Superior "for a period of ten years *from and after the date they cease to be an officer or employee of the corporation.*" (Emphasis added). Likewise, in Count I of its first amended petition, Plaintiff alleged that Edwards agreed not to engage in the gearbox business or use Plaintiff's trade secrets, etc., "for a period of ten years after Defendant Edwards ceased to be either an officer or employee of the Plaintiff."

This case is therefore comparable to *Willman v. Beheler,* 499 S.W.2d 770 (Mo.1973), in which the Supreme Court denied an appellant's request that a five-year non-competition covenant be enforced from the date of final judgment. "[T]his cannot be decreed," the Court held, "because the contract plainly provides that Beheler [the respondent] is not to practice medicine for the agreed period *from the date of his leaving the partnership,* and [appellant's] petition seeks injunctive relief under the provisions of the contract." *Id.* at 778.

Moreover, our review of reported Missouri cases uncovers but one in which a trial court or an appeals court ordered an injunction against competition to begin on the date of judgment. In *Southwest Pump & Machinery Co. v. Forslund,* 225 Mo.App. 262, 29 S.W.2d 165 (1930), the trial court ordered, and the appeals court upheld, a three-year injunction to begin on the date the court issued its decree. It should be noted, however, that the trial court in *Forslund* handed down that decree less than a month after the defendant resigned his position as president of the plaintiff company and began soliciting former customers. Also, at the time of the decree the defendant was still a member of plaintiff's board of directors. Thus, *Forslund* is distinguishable 1) because the span of time between defendant's resignation and the issuance of the decree was much shorter than in the instant case [10] and 2) because the court in *Forslund* was fashioning a remedy based on the fiduciary duties of a sitting company director, not enforcing the terms of a non-competition agreement.

Aside from *Forslund,* in every other discovered Missouri case in which an injunction was imposed (either by a trial court or a reviewing court), the injunction period has begun on the date the defendant resigned or was terminated.[11] This has been the practice even in cases like *Willman v. Beheler, supra,* in which the injunction period had already expired, or nearly so, by the time the reviewing court made its ruling. In *Willman,* the

---

10. In *Forslund,* the court issued its decree about one month after the defendant resigned; here, the court issued its order almost three and a half years after Edwards was terminated.

11. *See, e.g., Osage Glass, Inc. v. Donovan,* 693 S.W.2d 71 (Mo. banc 1985); *Nail Boutique, Inc.*

*v. Church,* 758 S.W.2d 206 (Mo.App.1988); *Mills v. Murray,* 472 S.W.2d 6 (Mo.App.1971). This list is far from exhaustive, but these three cases reflect the approach courts have consistently taken in other cases.

Supreme Court held valid a covenant restricting the defendant, a physician, from practicing medicine for five years within 20 miles of his business partner, another physician, if the partnership was ever dissolved. However, because the five-year period had almost run, and because the defendant had an established practice (albeit in violation of the covenant), the Court held that enforcing the five-year covenant from the date of judgment would be inequitable. Instead, it remanded the case for determination of possible damages to the former partner resulting from defendant's breach of the covenant.[12]

Similarly, in cases involving a non-competition agreement executed as part of a contract to sell a business, injunctions have invariably run from the date the parties executed the sales contract. *See, e.g., Champion Sports Center, Inc. v. Peters,* 763 S.W.2d 367 (Mo. App.1989); *Brown v. Childers,* 254 S.W.2d 275 (Mo.App.1953); and *Kreger Glass Co. v. Kreger,* 49 S.W.2d 260 (Mo.App.1932).

Based on *Willman,* we hold that Edwards' non-compete clause should not be enforced from the date of the judgment, because the Stock Purchase Agreement states otherwise and the petition was based on that agreement. The trial court's judgment, therefore, must be modified to indicate that the injunction commences on the date Edwards was terminated (October 10, 1988).

■ In considering how long Edwards should be enjoined from engaging in the gearbox business, we bear in mind that, to be enforced as written, a covenant restricting an employee's right to compete must be reasonably necessary to protect the employer's legitimate interests and reasonable as to time and geographical scope. *Cape Mobile Home Mart, Inc. v. Mobley,* 780 S.W.2d 116, 118 (Mo.App.1989), *citing A.B. Chance Co. v.*

*Schmidt,* 719 S.W.2d 854, 857 (Mo.App.1986). To make such an assessment, we must consider the circumstances surrounding the covenant, including its subject matter, the purpose it serves, the situation of the parties, the limits of the restraint, and the specialization of the business involved. *A.B. Chance Co.,* 719 S.W.2d at 857. In addition,

> [t]here are certain elements which should always be considered in ascertaining the reasonableness of such agreements in employment cases, among which are the consideration supporting the agreements, the threatened danger to the employer in the absence of such an agreement, the economic hardship imposed on the employee by such a covenant, and whether or not such a covenant would be inimical to the public interest.

*Mills,* 472 S.W.2d at 11 (quoting 54 Am.Jur. 2d, Monopolies, Etc., § 543) (footnote omitted).

■ If, after considering the restrictions imposed by a covenant (as agreed to by the parties or as enforced by a trial court), we determine that they are unreasonably broad, we will modify those restrictions accordingly. *Mid–States Paint & Chemical Co. v. Herr,* 746 S.W.2d 613, 616 (Mo.App.1988); *Orchard Container Corp. v. Orchard,* 601 S.W.2d 299, 303–04 (Mo.App.1980).

We recall that the purpose of a restrictive covenant like Edwards' "is to protect an employer from unfair competition by a former employee without imposing unreasonable restraint on the latter." *Continental Research Corp.,* 595 S.W.2d at 400. "Protection of the employer, not punishment of the employee, is the essence of the law." *Id.* An employer has protectable interests in two things: trade

---

12. *See also Continental Research Corp. v. Scholz,* 595 S.W.2d 396 (Mo.App.1980), in which the appeals court upheld a trial court's decision not to enforce the explicit terms of a non-competition covenant, which stated that the defendant-employee would be enjoined from the date a court rendered a judgment. Instead, the trial court enjoined the employee from the date he left the company. In upholding this ruling, the appeals court stated:

> It may be true that the trial court enjoined activity which was not logically enjoinable as it

had already taken place and the effect of the order was therefore superfluous. But that does not automatically lead to the conclusion that it was error to have failed ... to have made the 18 month non-compete restriction apply from the date of the trial court's order. Rather, the issue is the appropriateness and reasonableness of imposing additional injunctive relief to extend from the time of the court's order under the circumstances of the case. *Id.* at 400.

secrets and customer contacts. *Mid–States Paint & Chemical Co.*, 746 S.W.2d at 617.

In the instant case, up until the time of his dismissal, Edwards was in charge of Superior's sales and overall plant operations. For many years he had close contact with Superior customers all over the United States. The trial court was therefore warranted in issuing its broad injunction against "directly or indirectly engaging in the business of gearboxes, and related products, within the territorial limits of the United States." Superior had a valid concern that its customers all across the country might do business with Edwards at his new company.

One court explained this concern in the following way:

[I]n the sales industry the goodwill of a customer frequently attaches to the employer's sales representative personally; the employer's product becomes associated in the customer's mind with that representative. The sales employee is thus frequently in a position to exert a special influence over the customer and entice that customer's business away from the employer. An employer may properly protect itself against such an eventuality for a reasonable period of time. Because it is this special influence that justifies enforcement of non-compete covenants, the quality, frequency and duration of employee's exposure to the customers is of crucial importance in determining the reasonableness of the restriction.

*Continental Research Corp.*, 595 S.W.2d at 401 (citations omitted).

Superior's concern about competition from Edwards does not justify imposing an unreasonably long restraint on Edwards, however. Any special influence he could exert over Superior's customers would not last forever. Therefore, to serve its purpose, an injunction should be long enough to allow Superior to win back any goodwill its customers previously attached to Edwards—but no longer.

Relevant to an assessment of how long an injunction should be is evidence presented at trial that, after Edwards was terminated, Superior added a substantial sales force and its sales subsequently increased. This evidence indicates that Edwards' special influence over Superior's customers was diminishing or had already dissipated. Also relevant is Superior's failure to secure a preliminary injunction or a temporary restraining order to prevent Edwards from soliciting its customers. Although Superior requested a preliminary injunction in its petition filed in July 1989 and again in its amended petition filed in February 1991, it never requested a hearing on the matter. Neither did it seek a temporary restraining order. Had Edwards continued to threaten Superior's stock of customers after the July 1989 petition was filed, Superior had a remedy and could have pursued it. *See Continental Research Corp.*, 595 S.W.2d at 402–03.

The trial court's 10–year injunction against competition is unreasonably long. We find no Missouri cases holding that a 10–year restraint is reasonable against a terminated employee-at-will like Edwards. We hold that a more appropriate period is five years, measured from the date of Edwards' discharge.

In so holding, we again note that in many ways this case is comparable to *Willman, supra*, in which the Supreme Court held that a physician should be enjoined from competing against his former partner for five years. Like a partner, Edwards had a stake in the success of Superior, he was intimately involved with the day-to-day operation of the business, and he exercised considerable control as an executive and a stockholder. In addition, much more than a typical employee or sales representative, Edwards embodied Superior in the eyes of the company's customers, just as a physician embodies his or her partnership more than does the office secretary. For these reasons, Edwards' status during his negotiation of the Stock Purchase Agreement was far different from the typical sales person, field representative or operations manager who signs (and is required to honor) a covenant of one, two, or three years. *See, e.g., Osage Glass, Inc. v. Donovan*, 693 S.W.2d 71 (Mo. banc 1985); *Ashland Oil, Inc. v. Tucker*, 768 S.W.2d 595 (Mo.App.1989); and *Prentice v. Rowe*, 324 S.W.2d 457 (Mo.App.1959).

On the other hand, Edwards' position was not the same as someone who signs a non-

compete covenant in conjunction with selling a business. In cases based on such covenants, courts have enforced covenants of up to eight years or more. *Champion Sports Center, Inc.*, 763 S.W.2d at 368–69, (eight-year covenant enforced); *Schnucks Twenty–Five, Inc. v. Bettendorf*, 595 S.W.2d 279 (Mo. App.1979) (perpetual injunction enforced). Edwards was not in a position to demand as much consideration for his promise not to compete as would the typical seller of a business. This, coupled with the fact that Edwards' influence over Superior's customers has long since diminished, persuades us that the injunction against him should be limited to five years, measured from the date of his dismissal. A longer injunction would not protect Superior. The record indicates that, since early 1992, Edwards has been prevented from soliciting Superior's customers, and since that time Superior has had ample opportunity to neutralize any influence Edwards had over its customers. Further, a longer injunction would serve no public interest. It would only work an economic hardship on Edwards.

■ As a result of our holding, the injunction barring Edwards from working for a competing company has run its course. This does not mean, however, that Superior's rights are not to be vindicated. "Equity will not suffer a wrong to be without a remedy, and seeks to do justice and avoid injustice." *Willman*, 499 S.W.2d at 778. "In framing its decrees equity has a broad discretion to adapt the relief to the circumstances of the particular case. While a court of equity is reluctant to, and ordinarily does not, grant a mere money judgment, it may do so in an appropriate case, where the necessities of the situation require this type of relief." *Id.* (citations omitted).

We believe this is such an "appropriate case, where the necessities of the situation require this type of relief." Because the issue of damages was severed from the issue of liability in this case and has yet to be addressed, the trial court on remand should consider the matter of possible damages resulting from the breach of Edwards' covenant not to compete during the five years following his termination. On remand, the trial court is further directed to amend the judgment to recite that the injunction entered against Defendants commences on October 10, 1988, and extends for a five-year period from that date.

### III.

Defendants' third point on appeal is that the trial court erred by enjoining Defendants from using the plunge milling process for 10 years. In support of that contention, they propose the following two reasons:

(A) The trial court's finding that Superior's milling process is unique and a trade secret was against the substantial weight of the evidence, because the credible expert testimony was that the process is not unique and has been well known in the machining industry for many years; and

(B) The length of the court's injunction should have been no longer than six months, because the substantial weight of the evidence was that the plunge milling process could be discovered by inspection of a publicly available, finished gearbox, and that a plunge milling machine comparable to Superior's could be designed, assembled, and placed into production in, at most, six months.

### A.

■ Turning first to the issue of whether Superior's milling process is a trade secret, we note that the Missouri Supreme Court, in *National Rejectors, Inc. v. Trieman*, 409 S.W.2d 1, 18–19 (Mo. banc 1966), stated that an exact definition of the term "trade secret" is impossible. Nevertheless, the Court adopted the following general definition:

"A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.... A trade secret is a process or device for continuous use in the operation of the business. Generally, it

relates to the production of goods, as, for example, a machine or formula for the production of an article. . . .

". . . Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."

*Id. (quoting* Restatement of Torts § 757). In light of these six criteria, we hold that the trial court's determination that Superior's milling process is a trade secret was based on substantial evidence.

Although Defendants offered evidence to the contrary, Superior presented substantial evidence that its milling process is neither well known nor easily duplicated. It also presented evidence that its officers and employees, including Edwards and Bell during their years at Superior, have consistently taken pains to ensure the secrecy of Superior's milling process.

In addition, Superior established that the initial development of its milling process in 1976 required approximately six months of concentrated effort by a large, highly trained, well-equipped staff,[13] and that since 1976 Superior has continued to improve and refine that process. As a result, except for the duplicate milling process developed by Defendants, Superior's process was and is unique among gearbox manufacturers and has enabled the company to attain ascendancy in a highly competitive industry.

Evidence in the record (some of it from Defendants' own expert) indicates that, even though certain component parts, techniques, or concepts that went into developing Superior's process may be widely known, no other company or individual has been able to duplicate that process. At least one major competitor has tried and failed. Moreover, significant evidence was adduced that Edwards himself, by his actions and his words, admitted that Superior's methods and equipment were trade secrets.

Nevertheless, Defendants in essence contend that their contrary evidence on these points was more persuasive than Superior's. That contention, however, does not aid them on appeal, for we do not substitute our judgment for the trial court's on matters of credibility or when choices must be made between conflicting evidence. *In re Marriage of Felkner,* 847 S.W.2d 144, 147–48 (Mo.App. 1993); *Zweemer,* 823 S.W.2d at 534. Instead, we defer to the wide discretion accorded the trial court, even if there is evidence that would support a different conclusion. *Linnenbrink v. First Nat. Bank,* 839 S.W.2d 618, 621 (Mo.App.1992); *Calvary Heights Baptist Temple v. Molasky,* 733 S.W.2d 774, 775 (Mo.App.1987). For these reasons, we uphold the trial court's determination that Superior's plunge milling process is unique and is a trade secret.

### B.

■ Appraising the reasonableness of a 10–year injunction against revealing Superior's trade secrets is a more complex matter. Based on our reading of previous Missouri cases, such an appraisal requires consideration of facts that were not adequately developed at trial.

■ In cases like this, involving the misappropriation of trade secrets, Missouri courts employ the so-called "head start" rule. *Carboline Company v. Jarboe,* 454 S.W.2d 540, 552–53 (Mo.1970); *National Rejectors,* 409 S.W.2d at 42–44. Under that rule, Defendants are entitled to present evidence of how long it would have taken them to reproduce Superior's milling machine and process, absent the misappropriation.

The head start rule is based on the premise that, by misappropriating trade secrets,

---

**13.** Most of the staff was supplied by Superior's parent company, Detroit Tool & Engineering Company.

Defendants were able to cut short the time it would otherwise have taken them to reproduce Superior's machine and process. *See National Rejectors,* 409 S.W.2d at 42–43, *citing Midland–Ross Corp. v. Yokana,* 293 F.2d 411, 414 (3d Cir.1961) and *Schulenburg v. Signatrol, Inc.,* 33 Ill.2d 379, 212 N.E.2d 865, 869 (1965). In other words, Defendants received " 'the benefit of a headstart over legitimate competitors who did not have access to the trade secrets.' " *National Rejectors,* 409 S.W.2d at 43 (quoting *Winston Research Corp. v. Minnesota Min. & Mfg. Co.,* 350 F.2d 134, 142 (9th Cir.1965)). That does not mean, however, that Defendants should be enjoined for an unreasonable length of time. If they can show that, without the misappropriation, they could have reproduced Superior's machine and process in less than 10 years, they should be enjoined for no longer than that lesser period of time. *See Carboline,* 454 S.W.2d at 552–53; *A.B. Chance Co.,* 719 S.W.2d at 860–61.

It is apparent that the injunction in this case was based on the 10–year restraint in Edwards' Stock Purchase Agreement, rather than on an application of the head start rule. The trial court made no finding of how long it would have taken Defendants to develop a plunge milling machine and process comparable to Superior's, absent the misappropriation. Both sides offered some evidence, conflicting in nature, on this issue. However, there was no definite attempt to establish the time within which Split Case, with its original staff and manpower, could have discovered Superior's plunge milling process. Such a finding goes to the essence of the head start rule. *See National Rejectors,* 409 S.W.2d at 42–44. Clearly, there is no substantial evidence that it would have taken Defendants 10 years to reproduce a "copyable product." *A.B. Chance,* 719 S.W.2d at 861.

Since the issue of damages was reserved and further proceedings are necessary, we believe this Court should not, based on the record before us, attempt to determine an appropriate time period for an injunction. Rather, the parties should, if they desire, be given the opportunity to adduce additional evidence concerning the appropriate injunction period, with guidance from *National Rejectors* and *Carboline.* Accordingly, that part of the judgment enjoining Defendants from using the plunge milling process for 10 years must be reversed.

On remand, the trial court's determination of the time required to reproduce Superior's milling machine and process "should be made upon the basis of the manpower employed by defendants in their actual operation, not on the basis of what might have been accomplished with staffs of other size." [14] *National Rejectors,* 409 S.W.2d at 44. After making that determination, the trial court may then order an injunction for an appropriate length of time to begin on the date when Defendants actually misappropriated Superior's trade secrets. *Carboline,* 454 S.W.2d at 555.

### IV.

In Point IV, Defendants contend that the trial court erred by enjoining them from using the mark SCG in the advertisement or sale of gearboxes. Their contention is based on three assertions:

(A) There was no evidence that Superior began using the mark SGC prior to when Defendants began using the mark SCG;

(B) There was no substantial evidence that Superior's product had obtained a reputation associated with the mark SGC; and

(C) There was no substantial evidence that Defendants' use of the mark SCG was likely to cause confusion with Superior, because the only evidence was that Plaintiff was known in the gearbox industry as Superior Gearbox Company or Superior, not as SGC.

### A.

 Defendants argue that, based on the evidence adduced at trial, the trial court could not reasonably have concluded that Superior began using the mark SGC before Defendants began using the mark SCG. Analysis of this issue requires determining the appropriate definition of the word "use."

---

14. The trial court's assessment should be based on the assumption that none of the Defendants, including the staff of Split Case, knew any of Superior's trade secrets.

Traditionally, to obtain trademark rights in a symbol, that symbol must have been "used" in commerce. That is, one had to stamp or otherwise affix the symbol on the article or product to which it was associated, and that article had to be sold to a customer. *See, e.g., Oakes v. St. Louis Candy Co.,* 146 Mo. 391, 48 S.W. 467 (1898); *St. Louis Piano Mfg. v. Merkel,* 1 Mo.App. 305 (1876). Except for extraordinary situations, this meant one could not simply affix the symbol to a box containing the product.[15] It had to be on the product itself. Restatement of Torts § 718 cmt. b (1938).

In recent years, however, this strict requirement has been liberalized. For example, in the Restatement (Third) of Unfair Competition § 18 (Tentative Draft No. 2, 1990), we find: "A designation is 'used' as a trademark, trade name, collective trademark, or certification mark when the designation is displayed or otherwise made known to prospective purchasers in the ordinary course of business in a manner that associates the designation with the goods, services, or business of the user." Comment d of that same section explains: "Although physical affixation remains a common form of trademark use, the rule stated in this Section recognizes any manner of use sufficient to create an association between the designation and the user's goods or services."

Although we find no modern Missouri cases dealing with this issue, we note that Missouri's statutory law dealing with trademark rights and registration reflects this broadened view of what amounts to "use" of a symbol. In particular, § 417.005(8)[16] states that "a trademark shall be deemed to be 'used' in this state (a) on goods when it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto and such goods are sold or otherwise distributed in the state."

Missouri's statutory definition is patterned, word for word, after the definition included in the 1946 Lanham Trademark Act, 15 U.S.C. § 1127. It was that Act to which the Eighth Circuit Court of Appeals referred when responding to an argument that the use of a mark on packing slips and labels on the outer or shipping containers of electronic products did not constitute trademark use. *Electronic Communications, Inc. v. Electronics Components for Ind. Co.,* 443 F.2d 487 (8th Cir.1971). "This argument," the court said, "flies in the teeth of the plain language of the statute." *Id.* at 492.

In the instant case, Superior presented evidence that, as early as March 1989, it began stamping the mark SGC ™ GEARBOXES on labels affixed to boxes in which it shipped its gearboxes. Superior also presented evidence that it used this same mark on other containers, labels, advertisements, sales documents, and assorted letters and other communications with customers. It was upon this evidence that the trial court based its finding that Superior prominently used the mark SGC as a trademark in connection with its goods at or before March 4, 1989. We discern no error in that finding.

Defendants maintain that their use of the similar mark, SCG, began prior to March 1989. They admit that they have never affixed that mark to actual products. They point out, however, that on February 13, 1989, they began using the mark in connection with their company bank account, and on March 9, 1989, they applied for Missouri incorporation under the name SCG Company. (Their application was rejected that same day because another company had already incorporated under the name SCG.) These uses, they argue, dictate that their right to use the mark SCG should prevail against Superior's right to use SGC. We do not agree.

In an often-quoted definition of a trademark, the Supreme Court said: "There is no such thing as property in a trade-mark except as a right appurtenant to an *established business or trade in connection with which*

---

15. Obviously, no symbol could be attached to products like gasoline or liquid soap. In those cases, affixing the symbol to the product container was sufficient. *See* Restatement of Torts § 718 cmt. b (1938).

16. Statutory references are to RSMo 1986 unless otherwise indicated.

*the mark is employed." United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 97, 39 S.Ct. 48, 50, 63 L.Ed. 141 (1918) (emphasis added).

Accordingly, *"[a] trade-mark is* generally described as a *sign, device or mark by which the articles produced or dealt in* by a particular person or organization *are distinguished* or distinguishable from those produced or dealt in by others, and must be affixed to the goods or articles...." *Katz Drug Co. v. Katz,* 240 Mo.App. 739, 744, 217 S.W.2d 286, 289 (1949) (emphasis added).

Likewise, *"a trademark shall be deemed to be 'used'* in this state (a) *on goods when* it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto and *such goods are sold or otherwise distributed in the state...."* § 417.005(8).

In February and March 1989, Defendants had not established a business or trade; rather, they were in the process of establishing one. More importantly, they had not sold or distributed a single gearbox. That did not occur until October 1989. Any prior "use" they may have made of the mark SCG was not sufficient to create protectable trademark rights. We therefore hold that the trial court committed no error in finding that, for trademark purposes, Defendants' first use of the mark SCG occurred after Superior's use of the similar mark, SGC.

Furthermore, the equities in this case argue in favor of the trial court's decision.[17] Superior presented evidence that, immediately prior to his dismissal, Edwards was aware that Superior planned to begin using a new logo that emphasized the company's initials. That logo included, in part, a stylized (but recognizable) S surrounding a stylized (but also recognizable) G. In addition, the logo included the words SUPERIOR, GEARBOX, and COMPANY, arranged in the following stacked fashion:

**SUPERIOR GEARBOX COMPANY.**

Arguably, even in the absence of the more explicit mark SGC ™ GEARBOXES, this logo highlights Superior's initials, S, G, and C. Based on Edwards' knowledge of this logo, the trial court could reasonably have concluded that Defendants' subsequent decision to use the mark SCG was made in bad faith. *See Stern Electronics, Inc. v. Kaufman,* 669 F.2d 852, 857 (2d Cir.1982).

Buttressing this conclusion is the principle set out in *Bagby v. Blackwell,* 240 Mo.App. 574, 211 S.W.2d 69, 76 (1948), that a business person coming into a field already occupied by a rival with an established reputation "must do nothing which will unnecessarily create or increase confusion between his goods or business and the goods or business of his rival."

For the foregoing reasons, we find that Defendants' sub-point A has no merit.

**B.**

In sub-point B, Defendants contend that, because Superior introduced no evidence that its products had become associated with the mark SGC, the company failed to establish that it had a protectable interest in that mark. This argument also lacks merit.

The case on which Defendants base their argument is *Grocers' Journal Co. v. Midland Pub. Co.,* 127 Mo.App. 356, 105 S.W. 310 (1907), a case involving two parties claiming rights to confusingly similar newspaper names. Defendants focus on one section of that opinion, in which the appeals court stated that, for a person to have a protectable interest in a trade mark,

the mark must be stamped or otherwise affixed to a vendible commodity or thing actually in the market for a sufficient length of time at least to have obtained currency, acceptance, and reputation under and associated with the mark which points

---

**17.** As the Second Circuit Court of Appeals has pointed out, "the concept of priority in the law of trade-marks is applied 'not in its calendar sense' but on the basis of 'the equities involved.'"

*Chandon Champagne Corp. v. San Marino Wine Corp.,* 335 F.2d 531, 534 (2d Cir.1964) (quoting 3 Callman, Unfair Competition and Trade-Marks 1189, 1198–99 (2d ed. 1950)).

[to] or otherwise identifies its origin, ownership, or manufacture.

*Id.* 105 S.W.2d at 312.

Defendants' reliance on *Grocers' Journal* is misplaced, primarily because the marks at issue in that case are markedly different from those at issue in this one. *Grocers' Journal* involved newspaper names; the instant case involves initials—initials that, standing alone, are arbitrary and have no apparent meaning. That difference is crucial.

■ Whether a mark should receive trademark protection is initially analyzed by determining its strength. To do this, a court must categorize the mark as (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary. *General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 625 (8th Cir.1987); *Anheuser–Busch Inc. v. Stroh Brewery Co.*, 750 F.2d 631, 634 (8th Cir.1984). "A strong mark is usually fictitious, arbitrary or fanciful and is generally inherently distinctive. It is afforded the widest ambit of protection, and does not require proof of secondary meaning." *Gilbert/Robinson v. Carrie Beverage–Missouri*, 758 F.Supp. 512, 522 (E.D.Mo.1991), *rev'd in part on other grounds*, 989 F.2d 985 (8th Cir.1993).[18]

In contrast to an arbitrary or fanciful mark, a descriptive mark "tells something about the product." *Gilbert/Robinson* at 522. To receive trademark protection of a descriptive mark requires showing that it possesses secondary meaning. *Id.*

*Grocers' Journal*, the case cited by Defendants, involved a dispute between two corporations that published trade newspapers directed at the St. Louis area grocery industry. The disputed mark, a newspaper name, was

St. Louis Grocer and General Merchant. In our view, even though the *Grocers' Journal* court did not explicitly say so, that mark is descriptive.[19] The court was therefore correct in pointing out that, to prevail on the basis of trademark infringement, the plaintiff must show that its newspaper had "obtained currency, acceptance, and reputation under and associated with the mark." 105 S.W. at 312.

No such showing was required in the instant case, because the mark SGC is completely arbitrary and fanciful. In *Electronic Communications*, the Eighth Circuit Court of Appeals upheld a trial court's finding that the mark "ECI" (used first by Electronic Communications, Inc., and later by a jointly owned group of corporations) was arbitrary and fanciful. As explained by the appeals court, the basis for the trial court's finding was that the mark "was neither descriptive nor suggestive of any of the goods, generally termed electronic equipment, of either of the parties nor descriptive or suggestive of any of plaintiff's business or services." 443 F.2d at 488–89.

We find this reasoning persuasive. The mark SGC in no way describes or suggests the goods produced by Superior Gearbox Company and Split Case Gearbox Company. Thus, the mark SGC is completely arbitrary and fanciful. As such, Superior was not required to prove that the mark had acquired a secondary meaning.[20]

### C.

■ Defendants' final argument under Point IV is that the trial court erred in concluding that Defendants' use of the mark SCG was likely to cause confusion, because there was no evidence that Plaintiff was

---

18. "Secondary meaning" refers to an association in the buying public's mind between a mark and the company that produces or supplies the item on which the mark appears. *See generally,* 1 McCarthy on Trademarks and Unfair Competition (3d ed.) § 15.02[1].

19. For a list of more than 40 state and federal cases in which courts have reached comparable conclusions when assessing the names of newspapers, magazines, television programs, etc., *see* 1 McCarthy on Trademarks and Unfair Trade Competition (3d ed.) § 10.03[3].

20. Even if the mark SGC were not arbitrary and fanciful, we would not necessarily require a showing of secondary meaning. As the *Grocers' Journal* court itself pointed out, the strict requirements for proving trademark rights should, at times, be suspended in favor of the doctrine of unfair trade, a doctrine founded on the principle that "irrespective of the proprietary interest in the word or symbol which constitutes the trademark, ... one man has no right to palm off his goods or wares as those of another." 105 S.W. at 313.

known in the industry as anything but Superior or Superior Gearbox. Once more, we cannot agree.

As already mentioned, Superior was not required to show that the mark SGC had gained a secondary meaning. Therefore, whether Superior was known in the industry as SGC is irrelevant.[21] The only relevant question is whether the marks SGC and SCG are confusingly similar. The trial court, relying on *Postal Instant Press v. Personalized Instant Printing*, 201 U.S.P.Q. 732 (E.D.Mo. 1978), reasonably concluded the two terms are confusingly similar.[22]

Although Superior did not have to show that the two similar marks had actually caused confusion—merely that they were likely to[23]—the trial court reasonably found that at least three actual instances of confusion between the two companies had occurred.[24] In one, a load of aluminum castings had wrongfully been delivered to Superior's place of business instead of to Split Case Gearbox. In another, a supply of steel was delivered to Superior instead of to Split Case. In a third, a report by Dunn and Bradstreet indicated that Superior and Split Case were related companies.

While none of these incidents involved customers, a reasonable conclusion is that Defendants' continued use of the mark SCG would likely cause further confusion—especially among those consumers who ultimately buy the farm equipment and other machinery on which Superior's gearboxes are mounted. Whereas Superior's initial customers, equipment manufacturers, might be sophisticated enough to know whose gearboxes they are buying, the farmers and others who later purchase the equipment on which those gearboxes appear could easily be deceived.

Therefore, Superior produced more than enough evidence upon which the trial court could reasonably base its finding that confusion was likely.

## V.

 In Defendants' final point, they maintain that the trial court erred when it found that, by manufacturing gearboxes characterized by a so-called double web design (the same design used by Superior since at least 1976), Defendants violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),[25] and Missouri common law. The court erred, they claim, because its conclusion conflicts with an admission by Plaintiff that double webs serve a functional purpose. Defendants say that because the double web design is functional, it is therefore unprotectable, and the trial court's order enjoining them from producing gearboxes with double webs should be reversed.

Before discussing the merits of Defendants' point, a description of the double web design is warranted. Our description is based on various photographs received in evidence. At the front or "drive shaft" end of most Superior gearboxes, the aluminum shell or housing is elongated. This area is called the bearing hub, because nestled at the tip of it is a bearing that holds the front shaft in place and allows it to rotate. In order to strengthen this elongated hub area,

---

**21.** It is worth noting, however, that there was evidence that the company had become known as "SG."

**22.** Other letter combinations that courts have found to be confusingly similar include the following: AO and AOC, CCC and CSC, FDS and FDC, I.A.I. and ISI, IVC and JVC, TMS and TMM, TTM and T.M.T., WKM and WK. For full citations, *see* 2 McCarthy on Trademarks and Unfair Trade Competition (3d ed.) § 23.13[2].

**23.** *See LaTouraine Coffee Co. v. Lorraine Coffee Co.*, 157 F.2d 115, 117 (2d Cir.1946), *cert. denied*, 329 U.S. 771, 67 S.Ct. 189, 91 L.Ed. 663 (1946).

**24.** *See John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 978 (11th Cir.1983) (Although

evidence of actual confusion is not necessary, it is the best evidence of likelihood of confusion).

**25.** In pertinent part, Title 15 U.S.C. § 1125(a) provides as follows:

> Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

two fin-shaped pieces of aluminum are molded into the aluminum shell. If a gearbox were turned so that the drive-shaft end pointed up, this elongated hub portion would look somewhat like a rocket sitting upright on top of a square box. The webs would then look like fins or wings at the tail end of the space ship. Superior (and Split Case) gearboxes have two webs positioned side by side, relatively close together.

The crux of Defendants' argument is that, because these "fins" (webs) serve the functional purpose of strengthening the elongated portion, they are not protectable under federal and state trade law. Plaintiff, on the other hand, argues that, although the webs may serve a "function" in the lay sense of that word, they are not functional in a legal sense; rather, their essential purpose is to identify Superior Gearbox as the company that makes gearboxes with double webs.

The trial court in this case analyzed Defendants' use of Superior's double web design as a trade dress infringement. The trade dress of a product " 'involves the total image of a product and may include features such as size, shape, color, . . . texture, . . . or even particular sales techniques.' " *Contour Chair Lounge Co. v. True–Fit Chair, Inc.,* 648 F.Supp. 704, 713 (E.D.Mo.1986) (quoting *Prufrock Ltd., Inc. v. Lasater,* 781 F.2d 129, 132 (8th Cir.1986). Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), can be used to protect the trade dress of a product from confusingly similar imitations. *Contour Chair,* 648 F.Supp. at 713. Numerous courts have used this statute to protect the shape or design of a product. *See* 1 McCarthy on Trademarks and Unfair Competition (3d ed.) § 8.01[3] n. 24.

When analyzing a trade dress claim, courts have generally looked at three issues: 1) whether the trade dress is functional, 2) whether it has acquired a secondary meaning,[26] and 3) whether its imitation is likely to create confusion in the minds of consumers as to the source of the products. *See, e.g., Woodsmith Pub. Co. v. Meredith Corp.,* 904

F.2d 1244, 1247 (8th Cir.1990). Defendants question only the trial court's finding on the issue of functionality.

■ The functionality of a product design or shape can be viewed in two distinct ways. On the one hand, if the design is superior to other available designs and thus provides a competitive edge to the one who uses it, it is characterized as *de jure* functional. *In re Morton–Norwich Products, Inc.,* 671 F.2d 1332, 1337–1341 (USCCPA 1982). Such a design can be described as commercially "essential," *id.* at 1340, because not allowing others to use it would hinder competition or impinge upon their right to compete effectively in the sale of goods. *Woodsmith,* 904 F.2d at 1247 n. 6. A *de jure* functional design is not protectable under trademark law. *In re Morton–Norwich,* 671 F.2d at 1337. It may, however, be protectable for a limited period under patent law. *Best Lock Corp. v. Schlage Lock Co.,* 413 F.2d 1195, 1199 (USCCPA 1969).

In contrast, if a product design or shape is one of several, equally practical, efficient and competitive alternative designs, it is termed *de facto* functional. Under some circumstances, *de facto* designs are protectable. *In re Morton–Norwich,* 671 F.2d at 1337.

The findings of fact and conclusions of law issued by the trial court in this case indicate that it viewed Superior's double web gearbox design as *de facto* functional—not *de jure.* Chief among its findings was the following:

That there are many ways of forming bearing hubs without using Plaintiff's distinctive double web design. For example, the shaft/bearing hub could have one of the following: 1) internal webs, 2) no webs, 3) single webs, or 4) multiple webs. Moreover, webs themselves can be of many arbitrary configurations, none of which provide Plaintiff's unique appearance. The alternatives for the product appearance are virtually unlimited.

This finding was based on trial testimony and photographic exhibits that indicated Superi-

---

**26.** A recent United States Supreme Court case indicates that, as with trademarks, when trade dress is inherently distinctive, secondary meaning need not be shown. *Two Pesos, Inc. v. Taco*

*Cabana, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2753, 2758, 120 L.Ed.2d 615 (1992), *reh. denied,* —— U.S. ——, 113 S.Ct. 20, 120 L.Ed.2d 947 (1992).

or's competitors (other than Split Case) use a variety of gearbox designs, none of which duplicates Superior's double web configuration.[27] "The real purpose of the double web," the court stated, "is to act as an identification of source. Any other effect is incidental and insignificant."

The trial court's finding accords with a statement made in *Contour Chair:* "Some designs adopted for the purpose of identification are not wholly useless. In such a case protection would not be lost merely because the shape or feature also serves a useful purpose." 648 F.Supp. at 713.

The test for determining whether a distinctive feature is functional is well stated in *Brunswick Corp. v. Spinit Reel Co.,* 832 F.2d 513 (10th Cir.1987):

[T]he question of whether the feature is functional should turn on whether "the protection of the configuration would 'hinder competition or impinge upon the rights of others to compete effectively in the sale of goods.' "

... If that feature must be slavishly copied in order to have an equally functional product, then the feature is not entitled to protection. But if the feature enables the second-comer simply to market his product more effectively, it is entitled to protection.

*Id.* at 519 (citations omitted). Under this view, the trial court correctly determined that Defendants were not entitled to copy the double web design because that feature was unnecessary for Defendants to market an equally functional product. The feature allowed Defendants simply to market the products of Split Case more effectively.

As pointed out in 1 McCarthy on Trademarks and Unfair Competition (3d ed.) § 7.26[3][c], courts consistently have held that whether a product feature is functional is a question of fact. *See, e.g., LeSportsac, Inc. v. K Mart Corp.,* 754 F.2d 71, 76 (2d Cir.1985); *accord Sega Enterprises Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1530 (9th Cir. 1992). We therefore review the trial court's

finding on the issue of functionality by determining whether that finding was clearly erroneous. *LeSportsac, Inc.,* 754 F.2d at 76; *Vision Sports, Inc. v. Melville Corp.,* 888 F.2d 609, 615 (9th Cir.1989).

We hold that the court's finding was not clearly erroneous. The finding was based on ample evidence that Superior's design was only *de facto* functional and, therefore, was protectable.

## VI.

To summarize our holding, the judgment of the trial court is affirmed, with the following exceptions:

(A) That portion of the trial court's judgment (Paragraph 4) enjoining Edwards from engaging in the gearbox business for 10 years from date of judgment is reversed. The cause is remanded with directions to the trial court to enter a new judgment which recites that the injunction described in paragraph 4 commences on October 10, 1988, and runs for a five-year period thereafter. In addition, the trial court must determine the issue of damages to Superior resulting from the breach of Edwards' covenant not to compete during the aforesaid five-year period.

(B) That portion of the trial court's judgment (Paragraph 3(j)) enjoining Defendants from using the plunge milling process for 10 years from date of judgment is reversed. After hearing additional evidence consistent with the instructions outlined in this opinion, the trial court is directed to enter a new judgment enjoining Defendants from taking any of the actions described in paragraph 3(j) of the original judgment for an appropriate length of time beginning on the date Defendants actually misappropriated Superior's trade secrets.

It is so ordered.

PREWITT and SHRUM, JJ., concur.

27. Split Case, in contrast, built gearboxes that were virtually identical to Superior's. One photographic exhibit depicts a Superior gearbox and a Split Case gearbox side by side. The two

gearboxes are practically indistinguishable, not just with respect to the double webs, but in total design.